STATE of Missouri, ex rel. GTE NORTH, INC. and MCI Telecommunications, Corp., Respondents,

and

AT & T, Intervenor–Respondent,

v.

MISSOURI PUBLIC SERVICE COMMISSION, and Southwestern Bell Telephone Co., Appellants,

and

Office of Public Counsel, Intervenor–Appellant.

No. WD 44143.

Missouri Court of Appeals, Western District.

May 26, 1992.

Motion for Rehearing or Transfer Denied July 28, 1992.

Application to Transfer Denied Sept. 22, 1992.

Steven Dottheim and Penny G. Baker, Deputy Gen. Counsels, Jefferson City, for appellant Missouri Public Service Com'n.

Katherine C. Swaller, Alfred G. Richter, Jr., Paula J. Fulks, & Joseph F. Jedlicka, III, St. Louis, for appellant Southwestern Bell Telephone Co.

Janet L. Sievert, Asst. Public Counsel, Jefferson City, for intervenor-appellant Office of Public Counsel.

Dale E. Sporleder, GTE North, Inc., Westfield, Ind. and W.R. England, III, Brydon, Swearengen & England, P.C., Jefferson City, for respondent GTE North Inc.

Leland B. Curtis and Carl J. Lumley, Curtis, Oetting, Heinz, Garrett & Soule, P.C., St. Louis and Edward J. Cadieux, Sr. Atty., MCI Telecommunications Corp., St. Louis, for respondent MCI Telecommunications Corp.

Before KENNEDY, P.J., and FENNER and BRECKENRIDGE, JJ.

BRECKENRIDGE, Judge.

The Missouri Public Service Commission (Commission) appeals from an order of the circuit court reversing and remanding portions of the Commission's Report and Order issued in tariff proceedings concerning GTE North Incorporated (GTE North). A brief description of the principals and their relation to the issues in this litigation follows in order to facilitate an understanding of this appeal.

The Commission is a regulatory body, created and established by the Missouri legislature to regulate public utilities, including telecommunications companies pursuant to Chapter 386 and Chapter 392 of the Missouri Revised Statutes. The Commission, on appeal, challenges the judgments of the circuit court, claiming that: (1) the Commission did not err in accepting Staff determinations of test year revenues while rejecting GTE North's proposed Separation Factors;[1] (2) the Commission did not err in adopting a rate design wherein originating and terminating intrastate interLATA carrier common line charges (CCLCs) are greater than originating and terminating intrastate intraLATA CCLCs as such does not constitute discriminatory charges;[2] (3) the Commission did not err in not changing rates as requested by GTE North where there was no substantial and competent evidence produced to justify reductions in billing and collection charges; (4) the circuit court's judgments of October 24, 1990 and October 26, 1990 go beyond reversing and remanding to the Commission for further action and instead unlawfully set rates and charges; and (5) the circuit court lacks jurisdiction to enforce a remanded judgment and the Commission lacks jurisdiction to approve a tariff filing effectuating the circuit court's judgment once the Commission files an appeal to this court.

The Office of Public Counsel (OPC) intervened in the circuit court proceedings. The

---

1. GTE North's facilities are used to provide both intrastate and interstate services. It is necessary to make an accounting separation between intrastate and interstate jurisdictions. Separation Factors are expressed as a percentage, totaling 100% based upon studies to allocate expenses and investment between these jurisdictions.

2. IntraLATA and interLATA refer to geographic areas established during the divestiture of the Bell System. They are designations of the geographical areas in which telecommunications companies are allowed to operate. InterLATA defines the areas beyond which GTE North and other local exchange operators are not allowed to provide toll service. IntraLATA, conversely, are those areas in which GTE North and similar providers are allowed to provide toll services. Within its exchange area, GTE North has exclusive control of local access connections to consumers. To provide toll service MCI and the other interexchange telecommunications companies must use these connections through a switched access service purchased from the local companies. A Carrier Common Line Charge is an element of these access charges.

OPC, in support of the Commission's decision, points out that: (1) the difference in interLATA and intraLATA CCLCs is deeply rooted in telephone history; (2) the Commission's order wherein originating and terminating interLATA CCLCs are greater than originating and terminating intra-LATA CCLCs does not constitute unlawful discrimination; and (3) once a notice of appeal is filed in the Missouri Court of Appeals, jurisdiction lies with the appellate court, preventing execution of the circuit court judgment.

Southwestern Bell Telephone Company was also allowed to intervene in the circuit court proceedings. Southwestern Bell supports the position of the Commission as to the authorization of different rates for interLATA and intraLATA services.

GTE North, a Wisconsin corporation authorized to do business in Missouri, provides local exchange and other telecommunications services in its service area in Missouri, including intrastate switched access service.[3] GTE North is subject to the jurisdiction of the Commission. GTE North is a respondent in the instant case, supporting the decision of the circuit court.

Aligned with GTE North, MCI Telecommunications Company (MCI) intervened in the original Commission proceedings. MCI is an interexchange telecommunications company (IXC) authorized to provide intrastate interexchange telecommunications in Missouri. In that capacity, MCI is a customer of GTE North's intrastate switched access service. AT & T Communications of the Southwest, Inc., (AT & T) is also aligned with GTE North as an interexchange telecommunications company that purchases intrastate switched access service from GTE North.

### PROCEDURAL HISTORY

On March 23, 1989, GTE North filed proposed tariffs with the Commission which would have increased its annual revenues by a combination of increases and decreases in charges for various services. The net request was for an $8,355,000.00 increase in annual gross revenues. This case was docketed as TR–89–182. This case was eventually consolidated with No. TR–89–238 and No. TC–90–75. One of these cases, TC–90–75, involved a complaint by the Commission Staff against GTE North, initiated in the belief that GTE North was, in fact, overearning by approximately $1.3 million to $2.1 million. The Staff requested a decrease in GTE North's rate base.

On February 9, 1990, the Commission issued its Report and Order in TR–89–182. In that report, among other things, the Commission rejected the use of GTE North's proposed Separation Factors. Separation is the process by which a telephone public utility's investment, expenses, and revenues are allocated between interstate and intrastate operations. GTE North's proposed Separation Factors were based on 1988 data adjusted for Federal–State mandated changes effective January 1, 1989. The Commission decided instead to use Separation Factors based on 1988 data without these requested adjustments.

One of the proposals of GTE North was a decrease in billing and collection charges of $320,181.00 for interLATA toll calls and $39,936.00 for intraLATA toll calls to be collected under its contract with AT & T. The Commission rejected GTE North's proposed reduction, on the finding that there was insufficient evidence in the record for the adoption of the proposal.

The Commission also rejected GTE North's proposal to bring parity between interLATA and intraLATA CCLCs for both originating and terminating traffic. The Commission found that the proposed shift "results in too high a price for the GTE North customers to pay to achieve a minimum benefit for long-distance customers."

On March 12, 1990, GTE North filed a petition in the circuit court for a writ of review. MCI, an intervenor in the Commission proceedings, also filed for a writ of review on March 22, 1990. GTE North sought judicial review of the Commission

---

**3.** Switched access service is a service provided by GTE North and other telecommunications companies with monopolies over local exchange service to interexchange telecommunications companies for the purpose of providing these companies with access to local connections.

Report and Order, challenging the Commission's determination as to Separation Factors and billing and collection charges. MCI sought review on the inter-LATA/intraLATA issue. These cases were consolidated for review in the circuit court and in this appeal.

The circuit court found error in the Commission's acceptance of its Staff's computation of GTE North revenues and its rejection of GTE North's proposed level of investment and expenses based upon Separation Factors one day after the test year. The court below found that the Commission's failure to follow or explain why it was not following *Re Staff of Missouri Pub. Serv. Comm'n v. Southwestern Bell Tel. Co.,* 104 P.U.R.4th 381 (June 20, 1989), was error. The circuit court further found that the Commission erred in failing to make findings of fact and conclusions of law on the merits of GTE North's proposal to reduce billing and collection charges and found also that that part of the Commission's Report and Order regarding billing and collection charges was "unauthorized by law" and "made upon [an] unlawful procedure."

Finally, the circuit court concluded that the Commission's report was "unlawful and unreasonable because GTE North must charge MCI and other IXCs the same rates for switched access service regardless of whether MCI and other IXCs use that service to provide interLATA toll service or intraLATA toll service, in that GTE North provides exactly the same service under such circumstances." The circuit court found this to be discriminatory pricing prohibited by § 392.200.2, RSMo Supp.1991.

The circuit court remanded to the Commission directing it to "allow GTE North to increase local service rates and charges to recover the cost of service associated with the use of GTE North's proposed Separation Factors." On the issue of billing and collection charges, the circuit court directed the Commission to

... consider the evidence [on GTE North's proposal to reduce its Billing and Collection charges] and any additional evidence the parties may offer. Absent a

reasonable basis for not accepting GTE North's proposal, the Commission should approve the reduction in Billing and Collection charges with appropriate increases in the rates and charges for other services equal to the amount of the reduction.

The circuit court, on the interLATA/intra-LATA issue stated:

GTE North's access charges for the origination and termination of intra-LATA toll traffic, including the lower CCLC, are presumptively reasonable and compensatory. *See* Section 386.270 R.S.Mo. To achieve the parity required under Section 392.200.2 R.S.Mo., the higher CCLCs currently included in GTE North's access charges for the origination and termination of interLATA toll traffic, which were left in effect by the Report and Order, should be reduced to the level of the lower CCLCs included in GTE North's access charges for intra-LATA toll traffic.

The Commission directs this court to the above-quoted passages, claiming that the circuit court has unlawfully set rates and charges.

On November 26, 1990, the Commission petitioned the circuit court for a suspension of the judgment or, in the alternative, for a determination of lack of jurisdiction of the circuit court to remand and enforce the judgment once a notice of appeal is filed. The circuit court denied the petition. Thereafter the Commission filed its appeal to this court, and on the same date, the Commission filed a petition for a stay of the circuit court's judgments. This court granted a stay. The order further stated: "Appellant's motion for determination that Circuit Court lacks jurisdiction to remand once a Notice of Appeal has been filed therefrom will be taken with the appeal."

## STANDARD OF REVIEW

■ The scope of judicial review in Commission decisions is found in Mo. Const. art. V, § 18, and by statute in Chapter 386, RSMo 1986.[4] It provides that "such review shall include the determination whether the same are authorized by

---

4. All statutory citations are to Revised Missouri Statutes 1986, unless otherwise stated.

law, and in cases in which a hearing is required by law, whether the same are supported by competent and substantial evidence upon the whole record." Mo. Const. art. V, § 18. This court reviews the decision of the Commission rather than the judgment of the circuit court. *State ex rel. Marco Sales, Inc. v. Public Serv. Comm'n,* 685 S.W.2d 216, 218 (Mo.App.1984). In rate-making proceedings, a strong presumption exists in favor of the validity of the conclusions of an experienced administrative body after a complete hearing. *Smith v. Public Serv. Comm'n,* 351 S.W.2d 768, 771 (Mo.1961). The burden of proof is on the party seeking to set aside the order of the Commission to demonstrate, by clear and convincing evidence, that the challenged order is unlawful or unreasonable. Section 386.430.

■ Judicial review is restricted to whether the Commission's order was lawful and reasonable. *State ex rel. Conner v. Public Serv. Comm'n,* 703 S.W.2d 577, 579 (Mo.App.1986). "Questions of 'lawfulness' turn on whether the Commission's orders or decisions are statutorily authorized and questions of 'reasonableness' turn on whether there is competent and substantial evidence upon the whole record to support them." *Id.* Factual issues decided by the Commission are presumed to be correct and, until the contrary is shown, an appellate court is obligated to sustain the order of the Commission. *State ex rel. Missouri Office of Pub. Counsel v. Missouri Pub. Serv. Comm'n,* 782 S.W.2d 822, 824 (Mo.App.1990).

## CIRCUIT COURT'S JUDGMENT

Closely related to the standard of review used by this court in Commission cases, is the question of whether the circuit court went beyond its powers when it reversed and remanded the October 24, 1990 and October 26, 1990 judgments. The Commission contends that by its orders on remand, the circuit court unlawfully set rates and charges. The circuit court's directions as to the billing and collection issue and the Separation Factors are mooted by the holdings of this court on those issues. Because

this court is remanding the cause to the Commission due to the insufficiency of its findings and conclusions on the intraLATA and interLATA switched access issue, it is necessary to address the circuit court's usurpation of the Commission's rate-making function.

■ Missouri courts do not fix utility rates. *Lightfoot v. Springfield,* 361 Mo. 659, 236 S.W.2d 348, 353 (1951). Our courts may only review the Commission's rate-fixing orders and affirm or set aside or reverse and remand these orders. *Id.* The action which may be taken by the circuit court is set out in § 386.510. It states, in pertinent part:

> Upon the hearing the circuit court shall enter judgment either affirming or setting aside the order of the commission under review. In case the order is reversed by reason of the commission failing to receive testimony properly proffered, the court shall remand the cause to the commission, with instructions to receive the testimony so proffered and rejected, and enter a new order based upon the evidence theretofore taken, and such as it is directed to receive. The court may, in its discretion, remand any cause which is reversed by it to the commission for further action. No court in this state, except the circuit courts to the extent herein specified and the supreme court or the court of appeals on appeal, shall have jurisdiction to review, reverse, correct or annul any order or decision of the commission or to suspend or delay the execution or operation thereof, or to enjoin, restrain or interfere with the commission in the performance of its official duties. The circuit courts of this state shall always be deemed open for the trial of suits brought to review the orders and decisions of the commission as provided in the public service commission law and the same shall be tried and determined as suits in equity.

Section 386.510.

"The circuit court has no power to interfere with the decisions of the Commission except to affirm, reverse, or reverse and remand and when a decision is reversed

and remanded, it is remanded to the Commission 'for further action.' " *State ex rel. Anderson Motor Serv. Co. v. Public Serv. Comm'n,* 234 Mo.App. 470, 134 S.W.2d 1069, 1075–76 (1939), aff'd, 348 Mo. 613, 154 S.W.2d 777 (1941). The decision in *Anderson,* adopted by the Missouri Supreme Court, makes it clear as to what the circuit court can or cannot do. It states:

> The court has no authority to direct the Commission what order to make or to grant the authority sought by the application. The court can not modify the decree or entirely displace it with one of its own or attempt to tell the Commission what its action should be. Except when the Commission has excluded evidence that it should have received the cause may be remanded with directions to hear such evidence and to make an order as provided by section 5234. *State ex rel. Detroit–Chicago Motor Bus Co. v. Public Service Commission,* 324 Mo. 270, 23 S.W.2d 115 [1929]. The Legislature did not intend that the reviewing court should put itself in the place of the Commission, try the matter anew as an administrative body, weigh the evidence and substitute its finding and judgment on the merits as that of the Commission. The sole matter for the court's attention is whether the order complained of is reasonable and lawful, and, if it appears that the order is both reasonable and lawful, it must be affirmed; if it be found to be unreasonable or unlawful, it must be set aside. *State ex rel. Kansas City Power & Light Co. v. Public Service Commission,* 335 Mo. 1248, 76 S.W.2d 343 [1934].

*Anderson,* 134 S.W.2d at 1076. The Supreme Court discussed limitations on the court's powers of review and the reasoning behind such limitations in *State ex rel. Chicago, Rock Island & Pac. R.R. v. Public Serv. Comm'n,* 312 S.W.2d 791 (Mo. banc 1958). As an agency of the legislature, the Commission's powers are derived from the police powers of the state. *Id.* at 796.

In so holding, the court stated:

> As long as the commission acts in accord with due process of law and its findings and decisions do not run afoul of constitutional and statutory requirements and the inherent powers of the courts, it is engaged in an exercise of the police power of the state, with which it is not the province of the courts to interfere.

*Id.* at 796.

■ The circuit court, in the instant case, went beyond what is allowable. Its orders cannot be read as merely remanding to the Commission for further action, but encompass the rate-making function which is the exclusive preserve of the Commission. The Commission was directed in the judgment of October 24, 1990, "to stop charging different rates for the same access service by reducing the Carrier Common Line Charges included in the rates for switched access service used to provide interLATA toll service to the level of the Carrier Common Line Charges included in the rates for switched access service used to provide intraLATA toll service." In this instance the circuit court is going beyond a remand for further action. Instead, the court is usurping the rate-making function of the Commission.

The court directs the method the Commission must use to achieve parity between interLATA and intraLATA CCLCs. The court examined the question of whether the difference in the charges for both types of CCLCs was discriminatory. Upon finding that it was, the court ordered that parity between the services be accomplished. In choosing the method, the court improperly set a rate for the service. MCI argues that this was not really a rate-making because the circuit court was merely directing the Commission to take the only permissible course of action, given the presumption that the rates for the origination and termination of interLATA toll traffic were presumptively reasonable and compensatory. As the Commission points out, however, there are other methods that the Commission could use to achieve parity within the limits of its discretion. For example, raising the intrastate intraLATA CCLCs to the level of the intrastate interLATA CCLCs could be used to achieve parity or a combination of increases and decreases could be

utilized after a reexamination based on the premise that such differences in pricing are discriminatory.

GTE North does not address the issue of whether or not the actions of the court amounted to a rate-making. Instead it frames the question of whether appellate courts may provide directions and instructions with a reversal and remand of their orders and decisions. This is a broader categorization of the principles involved in the instant case. The proper question is what can a court order upon remand of a Commission case. The *Anderson* case makes it very clear that the only instance in which a court may tell the Commission what its action should be is in a case where the Commission has excluded evidence that it should have received. *Anderson*, 134 S.W.2d at 1076.

It is noted that GTE North cites to several cases in which directions were provided by a reviewing court to the Commission. In these cases the Commission could have taken no other action than that directed by the court. *State ex rel. Hoffman v. Public Serv. Comm'n*, 550 S.W.2d 875 (Mo.App. 1977); *State ex rel. Kansas City S. Ry. v. Public Serv. Comm'n*, 325 Mo. 862, 30 S.W.2d 112, 117–18 (1930); *State ex rel. Philipp Transit Lines, Inc. v. Public Serv. Comm'n*, 523 S.W.2d 353, 355–59 (Mo.App. 1975); *State ex rel. Kansas City v. Public Serv. Comm'n*, 524 S.W.2d 855, 865 (Mo. banc 1975).

GTE North also cites language in § 386.510 which provides that in the circuit court's performance of judicial review, the case "shall be tried and determined as suits in equity." It directs us to *State ex rel. Consumers Pub. Serv. Co. v. Public Serv. Comm'n*, 352 Mo. 905, 180 S.W.2d 40, 44 (1944), as authority that such review is in the nature of a declaratory judgment. Thus, GTE North contends, this court should consider that in a declaratory judgment proceeding, a court may provide such relief as equity dictates and the record supports. *Melton v. Ensley*, 421 S.W.2d 44, 54 (Mo.App.1967).

The clause "shall be tried and determined as suits in equity" was construed in *State*

*ex rel. Chicago, Rock Island & Pac. R.R. v. Public Serv. Comm'n*, 312 S.W.2d at 791. The court points out that the clause, as used in the statute is vague but that it is clear that it is not intended to confer general equitable powers upon the reviewing court. *Id.* at 796. The court thus concluded:

> Consequently, we are convinced and we hold that the clause in Section 386.510 stating that cases on review "shall be tried and determined as suits in equity", construed in the light of the overall remedial purposes of the entire act, means no more than that when the court has determined whether an order or decision of the commission (made in the lawful exercise of its discretionary powers) is supported by competent and substantial evidence upon the whole record and is reasonable, or, as is sometimes conversely stated, whether it is arbitrary or capricious or is against the overwhelming weight of the evidence, the court has performed its whole duty.

*Id.* at 796.

The remainder of the cases cited by GTE North do not support its contentions, either being inapplicable to the rate-making issue or based upon general principles of law not specifically applicable to Commission cases. Thus, this court holds that the circuit court exceeded its authority by improperly directing the specific actions to be taken by the Commission in setting rates.

## STAY ON APPEAL TO COURT OF APPEALS

Upon the entry of the circuit court's judgment reversing the order of the Commission, which contained directions now found to be beyond the jurisdiction of the circuit court, GTE North and MCI informed the Commission that they wished to implement the circuit court's orders of October 24, 1990 and October 26, 1990. GTE North, in its brief, claims that it was desirous of increasing its rates for basic local exchange service on an interim basis, subject to a refund with interest, until a final decision was reached on appeal. The Commission, strongly disagreeing with this

course of action, asked the circuit court to stay its judgment. The circuit court denied its petition.

The Commission filed a notice of appeal with this court. On this same date, in anticipation of GTE North's and MCI's attempted execution on the circuit court's judgments, the Commission petitioned for a stay of the circuit court's judgments. In said petition, the Commission prayed that this court (1) stay the circuit court judgment pending the appeal; (2) determine that the circuit court lacks jurisdiction to remand and enforce its judgment once notice of appeal has been filed; and (3) determine that the orders and decisions of the Commission are *prima facie* lawful and remain in effect even after having been reversed by the circuit court once an appeal is filed. This court granted a stay. GTE North and MCI challenge the stay or "stop order" as no supersedeas bond was filed by the Commission before the entry of said stay.

This court further ordered that, "Appellant's motion for determination that Circuit Court lacks jurisdiction to remand and enforce judgment once a Notice of Appeal has been filed herefrom will be taken with the appeal." This motion and the effect of this court's stay are addressed herein.

■ The Commission argues that the filing of a notice of appeal accompanied by payment of the docket fee (not applicable to the Commission under § 386.440.3) is the only requirement necessary to invoke appellate jurisdiction and make an appeal effective. *Herrick Motor Co. v. Fischer Oldsmobile Co.*, 421 S.W.2d 58, 62 (Mo. App.1967). Although the circuit court does not lose its jurisdiction over records or of the authority to exercise ministerial or execute functions prior to the filing of the transcript on appeal, the filing of the notice of appeal suspends any further exercise of the circuit court's judicial function. *Id.* The Commission argues this somehow affects a party's ability to execute on such judgment.

Section 386.270 provides:

All rates, tolls, charges, schedules and joint rates fixed by the commission shall be in force and shall be prima facie lawful, and all regulations, practices and services prescribed by the commission shall be in force and shall be prima facie lawful and reasonable until found otherwise in a suit brought for that purpose to the provision of this chapter.

In addition, § 386.430 states:

In all trials, actions, suits and proceedings arising under the provisions of this chapter or growing out of the exercise of the authority and powers granted herein to the commission, the burden of proof shall be upon the party adverse to such commission or seeking to set aside any determination, requirement, direction or order of said commission, to show by clear and satisfactory evidence that the determination, requirement, direction or order of the commission complained of is unreasonable or unlawful as the case may be.

Thus, the Commission argues that the rates it set are *prima facie* lawful with the burden of proof resting upon the party adverse to the Commission, even where the circuit court reversed the Commission's determination. *State ex rel. Empire Dist. Elec. Co. v. Public Serv. Comm'n*, 714 S.W.2d 623, 625 (Mo.App.1986). This court reviews the order of the Commission, not the decision of the circuit court. *Id.*

The Commission also directs attention to § 386.540 which states, in pertinent part:

1. The commission and any party, including the public counsel, who has participated in the commission proceedings which produced the order or decision may, after the entry of judgment in the circuit court in any action in review, prosecute an appeal to a court having appellate jurisdiction in this state. Such appeal shall be prosecuted as appeals from judgment of the circuit court in civil cases except as otherwise provided in this chapter....

\*     \*     \*     \*     \*     \*

3. The circuit court may in its discretion suspend its judgment pending the hearing in the supreme court or court of

appeals on appeal, upon the filing of a bond by the corporation, person or public utility with good and sufficient security conditioned as provided for bonds upon actions for review and by further complying with all terms and conditions of this law for the suspension of any order or decision of the commission pending the hearing or review in the circuit court. This bond shall be in addition to the cost bond heretofore provided in this section.

4. The general laws relating to appeals to the supreme court and the court of appeals in this state shall, so far as applicable and not in conflict with the provisions of this chapter, apply to appeals taken under the provisions of this chapter.

In effect, the Commission is arguing that specific provisions of Chapter 386 control and the general principles pertaining to civil appeals are inapplicable. Particularly, the Commission argues that a narrower applicability exists between general principles regarding civil appeals and the appellate provisions of § 386.540 because this court reviews the Commission determination and not the judgment of the circuit court.

GTE North and MCI take the position that the general laws pertaining to appeals are applicable to appeals of the circuit court's judgments. In *State ex rel. Southwestern Bell Tel. v. Brown*, 795 S.W.2d 385, 389 (Mo. banc 1990), the Missouri Supreme Court noted that where a statute is silent on procedural matters, generally applicable rules pertaining to the circuit court's control of its judgment apply. GTE North also notes that the Commission has, in other cases, approved interim tariffs in situations such as the one in the instant case.

There are two specific statutory provisions providing for stays in analogous review proceedings. Section 386.540.3 provides for stays and bonds requested by a "corporation, person or public utility...." Section 386.520 discusses stays and bonds in the context of parties petitioning for a writ of review, mentioning a "corporation, person or public utility." The Commission

is not denominated in either statute and the statutes do not provide for the Commission to apply for a stay or file a bond.

Section 512.080 is the general statute applicable when appeals stay execution. Appeal stays execution where the appellant is "a personal representative, guardian, or conservator ... or when the appellant shall be a county, city, town, township, school district or other municipality." Section 512.080.1(1). *See also* Rule 81.09. The only other method provided in the statute for staying execution is by way of supersedeas bond. The statute provides that an appeal shall stay execution "[w]hen the appellant, at or prior to the time of filing notice of appeal, presents to the court for its approval a supersedeas bond which shall have such surety or sureties as the court requires." Section 512.080.1(2). After an action is transferred to the appellate court, application for leave to file a bond may only be made in the appellate court. Section 512.090.

Missouri case law provides additional insight into the staying of judgments on appeal. At common law a writ of error operated as a supersedeas of all proceedings on the circuit court's judgment; the same was true of an appeal in chancery. *State ex rel. Dean v. Douglas*, 236 Mo.App. 1284, 165 S.W.2d 304, 307 (1942). This was true because at common law, appeals in actions at law were unknown. *Id.* In Missouri, the right to appeal is a creature of statute. Thus, in determining whether a right to supersedeas exists as an incident of an appeal, it is the governing statute that must be examined. *Id.* "[W]here the statute deals with the question of supersedeas, by specifically providing in clear language the character of cases where the appeal will operate as a supersedeas, that class cannot be extended by construction, but rather, in such cases the statute impliedly negates the right in other cases." *Id.; See also Green v. Perr*, 238 S.W.2d 922 (Mo. App.1951).

Recently, in *Roussin v. Roussin*, 792 S.W.2d 894 (Mo.App.1990), this principle was reaffirmed. The court stated, "[T]he purpose of a supersedeas bond is to stay

execution pending the appeal, of an order commanding some act to be done, where the case is not within the class of cases in which the appeal itself operates as a supersedeas." *Id.* at 898.

The Commission is not mentioned in the class of cases in which an appeal operates as a supersedeas in and of itself. Thus the contention that the Commission belongs in that class is impliedly negated. There is nothing in Chapter 386 which conflicts with the general law relating to appeals. The Commission's contention that these generally applicable rules do not apply is, therefore, untenable.

There may be a practical explanation why the Commission is not designated by any statute to file for a stay which would require the filing of a bond. "The sole and only purpose of an appeal bond is to stay the issuance of an execution until the cause can be passed upon and disposed of by the appellate court." *State ex rel. Gnekow v. United States Fidelity & Guar. Co.*, 150 S.W.2d 581, 584 (Mo.App.1941). A bond guarantees that a party's ability to collect on a judgment is not impaired although execution is deferred, if that party is successful on appeal. The Commission is a governmental entity without funds available to reimburse a utility for sums not collected in the event the utility ultimately proves successful in its appeal. Therefore, the Commission could not file a valid bond and, since there is no specific statute authorizing a stay without a bond, the Commission is not entitled to the issuance of a stay.

■ The remaining issues in the Commission's motion concern whether execution on the circuit court's judgment is available during the pendency of the appeal and whether, upon a reversal by the circuit court, the Commission's orders remain *prima facie* lawful and in effect. It is necessary first to consider the nature of the appellate process established by Chapter 386.

The filing of a writ of review initiates the first step of what can be a three-tiered review by the circuit court, the court of appeals and the supreme court. It is important to note that at each level the court reviews the Commission's Report and Order, rather than the decision of the lower court or courts. Each court on review may only affirm, reverse, or reverse and remand. No court on any of the three levels may enter any order which sets rates or controls the ultimate decision of the Commission.

Under the general principles applicable to civil appeals, the judgment of the circuit court can be executed upon unless stayed on appeal by the filing of a supersedeas bond. Because the role of the circuit court is not as a trial court, but instead as a court of review, under possible rulings of the circuit court there would be no final judgment in the traditional sense for execution purposes pending the completion of the review process by the appellate courts.

There are any number of possible scenarios considering whether the original orders of the Commission, as reviewed, resulted in a rate increase, a rate increase in an amount less than that requested by the utility, or a rate reduction, or as in the case at bar, a combination of increases and decreases. The number of scenarios multiply when considering the possible rulings of the courts during the pendency of a three-tiered review. Due to the complexity of issues raised by all these possibilities, some of which are more easily resolved than others, this court will seek to address only the limited circumstances of this case.

The Commission's Report and Order ultimately granted a rate increase, but in an amount less than that requested by GTE North. The issues on appeal, however, also include GTE North's objection to the Commission's failure to reduce the billing and collection rate and MCI's appeal of the Commission's failure to grant parity for originating and terminating intrastate InterLATA and IntraLATA CCLCs.

Unquestionably, the orders of the Commission were presumptively valid under the provisions of § 386.270 prior to the ruling of the circuit court. The parties aggrieved by the Commission's decision have the right to protect their interests by applying to the circuit court for a stay of enforce-

ment of the Commission's order pursuant to § 386.520. This section provides the opportunity to stay the Commission's order upon issuance of a stay order by the circuit court and the filing of a bond. It also contains provisions allowing for the payment into the court registry of "such sums as [the utility] may collect from and after the date of entry of this order which it would not have been entitled to collect but for this stay." These funds are subject to refund upon the determination on appeal that they were improperly collected. The courts have not previously ruled whether § 386.520.1 is available when the decision of the Commission results in a rate increase. *State ex rel. Kansas City v. Public Serv. Comm'n,* 362 Mo. 786, 244 S.W.2d 110 (1951). Subsections 2, 3 and 5 of § 386.520, by their nature, are available only when the Commission's order results in a rate decrease. *Id.*

No application for a stay of the Commission's orders was requested prior to the circuit court judgment. Upon the entry of the judgment of the circuit court, if it results in an affirmance of the Commission's orders, said Commission orders clearly remain valid and in effect. Parties aggrieved thereby have the additional remedy of the ability to request a stay of the circuit court judgment affirming the orders under § 386.540.3.

It has been determined that the Commission has no right to stay the execution of the circuit court order, because it is unable to post a valid supersedeas bond and is not exempted from the requirement of filing such a bond. Upon a ruling adverse to the Commission in the circuit court, the nature of the circuit court order will be for a remand of the case to the Commission for further proceedings. There is no "judgment" available for execution in the traditional sense. If this court were to find that the circuit court judgment was subject to execution, since the Commission is unable to obtain a stay, the absurd result would be that the Commission would be obligated to resume the rate setting process while the appeal proceeds. It is not unreasonable to project that there could be, simultaneous

with the original appeal, a second appeal filed and proceeding from the rulings of the Commission upon remand. Such a result would be unworkable.

In interpreting the language of § 386.270 stating the orders of the Commission shall "be in force and shall be prima facie lawful and reasonable until found otherwise in a suit brought for that purpose pursuant to the provisions of this chapter," the Court applies the rules of statutory construction. In determining the intent of the legislature, statutes are interpreted according the words used their plain and ordinary meanings. *Weston Point Resort Condominium Owners' Ass'n, Inc. v. Floro,* 796 S.W.2d 928, 930 (Mo.App.1990). Statutes are in *pari materia* when they relate to the same subject matter and construction of said statutes proceeds on the assumption that the statutes in question are to be read with consistency and in harmony. The legislature is presumed to have enacted laws serving the welfare of its constituents and not laws which are absurd. *State ex rel. Lack v. Melton,* 692 S.W.2d 302, 304 (Mo. banc 1985).

Considering the intent of the legislature to enact a statutory design which promotes orderly setting of rates and review of the rates as set, the most reasonable construction of § 386.270 requires the finding that the legislature intended the orders of the Commission to remain in force and be *prima facie* lawful until found otherwise by the ultimate ruling of a court at the conclusion of the appeal process.

GTE North argues that rather than the orders of the Commission retaining their validity despite a ruling adverse to such orders by the circuit court, the judgment of the circuit court should be subject to execution. This execution would result in the Commission conducting further proceedings on a remand from the circuit court. GTE North further postulates that the purpose of the remand would be for the Commission to proceed with the implementation of interim rates. These interim rates would be in effect pending the outcome of the appeal. In support of this interpretation, GTE North does not cite any authority

for interim rates under Chapter 386. Interim rates have been utilized by the Commission to allow public utilities to collect revenues subject to refund pending judicial review after the Commission's order when those orders have been reversed by the circuit court. Although there is nothing to prohibit the Commission from authorizing interim rates, there is no authority for finding that execution of a circuit court judgment is in fact a remand for implementation of interim rates.

Therefore, this court rules that an adverse ruling on the Commission's order by the circuit court does not invalidate the order of the Commission while the appeal continues. The effect of this ruling on the parties contesting the Commission's orders by court review, is that said parties are protected through the same avenues allowing them to obtain a stay of such orders as were available prior to the circuit court, with additional provision for a stay pursuant to § 386.540.3.

The stay issued by this court on December 11, 1990, is hereby quashed.

## SEPARATION FACTORS

In its next point, the Commission argues that it did not err in accepting its Staff's determination of test year revenues while rejecting GTE North's proposed Separation Factors because: (1) test year and known and measurable adjustments are factual questions within the expertise of the Commission; (2) the Commission has not violated the test year concepts of matching revenues, expenses and rate base representative of the foreseeable future, during which time the rates being set will be in effect; and (3) there was no error on the part of the Commission in not following its earlier decision in a case involving Southwestern Bell.

"The accepted way in which to establish future rates is to select a test year upon the basis of which past costs and revenues can be ascertained as a starting point for future projection." *State ex rel. South-*

*western Bell Tel. Co. v. Public Serv. Comm'n,* 645 S.W.2d 44, 53 (Mo.App.1982). A test year is a tool used to find the relationship between investment, revenues, and expenses. Certain adjustments are made to the test year figures; "normalization" adjustments used to eliminate nonrecurring items of expenses or revenues and "annualization" adjustments used to reflect the end-of-period level of investment, expenses and revenues. Adjustments are also made for events occurring outside the test year. The criteria used to determine whether a post-year event should be included in the analysis of the test year is whether the proposed adjustment is (1) "known and measurable," (2) promotes the proper relationship of investment, revenues and expenses, and (3) is representative of the conditions anticipated during the time the rates will be in effect.

The test year agreed upon by GTE North and the Commission Staff in the instant case was the twelve months ending December 31, 1988. The test year of 1988 was selected because it produced more favorable revenue requirements for GTE North than either 1987 or 1989. The parties did not agree, however, on the appropriate post-year adjustments. GTE North proposed the use of 1988 Separation Factors with several adjustments including one for known Federal–State mandated changes effective as of January 1, 1989. The Commission Staff objected to such adjustments.

GTE North's facilities are used to provide both intrastate and interstate services. Because the Commission only has the authority to set rates and charges to recover costs attributable to intrastate services, it is necessary to make an accounting separation between the interstate and intrastate jurisdictions. The Federal–State mandated changes, proposed by GTE North as adjustments, result in a greater allocation of GTE North's investment and expenses to the Missouri intrastate jurisdiction. The first of these changes is a transition from a weighted Dial Equipment Measurement (DEM) to an unweighted DEM factor.[5]

5. The DEM factor is used in the allocation of GTE North's "Category 3" investment and ex-

pense between intrastate and interstate jurisdiction. Category 3 is the classification for invest-

The Federal change has a net effect of allocating more of GTE North's investment and expense to the intrastate jurisdiction category. The second Federal–State mandated change also has the same effect by shifting non-traffic sensitive or fixed costs from interstate to intrastate jurisdiction. Beginning in 1986 each local exchange telephone company began an eight year transition to a 25 percent allocation of non-traffic sensitive costs to the interstate jurisdiction. This allocator is referred to as the "gross allocator." These changes are not isolated events but represent a continuation of progressive increases in allocations from the interstate to the intrastate jurisdiction.

The Commission Staff originally proposed the use of unadjusted 1988 Separation Factors. The Staff later proposed alternative Separation Factors based upon the inverse of the 1989 projected interstate Separation Factors filed by GTE North in its Tariff Review Plan and adopted by the Federal Communications Commission (FCC). Since Separation Factors allocate investment, expenses and revenues between the intrastate and interstate operations, the total of the intrastate and interstate Separation Factors should represent 100 percent of GTE North's investment, expenses and revenues. It is reasonable then to determine GTE North's intrastate Separation Factors from the inverse of the interstate factors for 1989 submitted by GTE North in its Tariff Review Plan. This Tariff Review Plan as submitted to the FCC on December 31, 1988, contained actual 1988 data, as well as prospective 1989 data.

The Commission held:

The Company proposes to increase its intrastate rate by using what it claims are the latest known separation factors as of January 1, 1989. The Staff, by use of actual 1988 separation factors, proposes to reduce the Company's rate base by $1,176,000. As a result, the Staff also proposes to reduce the expense portion of the adjustment by $522,000 annually.

ment and expenses related to central office switching equipment and to the provision of toll

The separation factors used by the Staff were provided by the Company in response to a data request. The Staff also calculated the Company's revenue requirement based on known separation factors at the end of July, 1989. The use of those more current separation factors changed the revenue requirement for the Company ranging from a reduction of $73,000 to an increase of $56,000 over actual 1988 data. The Staff also used separation factors based on the inverse of the Tariffs Review Plan filed with the Federal Communications Commission December 31, 1988. Comparisons of the actual 1988 factors and the annualized factors through June, 1988, indicate that the factors filed in the Tariff Review Plan are more accurate than the Company's filing made in this case. In the Commission's opinion it is logical to use the inverse of the filed Tariff Review Plan factors that relate to the interstate jurisdiction as they logically represent the factors which relate to the remaining intrastate jurisdiction.

The Company used factors which contain the effects of known changes and the effects of proposed changes within the Missouri study area of the Company.

In the Commission's opinion, the Staff's method of determining separation is more reasonable than the Company's which includes projected data. Staff's separations calculation should be adopted and the proposed adjustments should be placed into effect.

GTE North is not contesting the annualization of revenues used by the Commission. GTE North does contend, however, that the Commission's decision to use what it claims are unadjusted factors was arbitrary and capricious as this failed to keep a proper balance among investment, revenues and expenses in its determination of GTE North's financial condition, the purpose of which was to set rates. This contention and the holding of the circuit court are not correct. The Commission did not

service.

act arbitrarily and capriciously in its determination not to use GTE North's proposed Separation Factors.

The Commission cites *State ex rel. Kansas City Power & Light Co. v. Public Serv. Comm'n,* 615 S.W.2d 596, 597 (Mo.App. 1981), for the proposition that test periods and adjustments thereto are factual questions. The court stated, "Test periods for determining prospective operating costs have been traditional in rate cases. The extent of adjustment for known variations is essentially a fact question." *Id.* at 597. This observation is dicta, as the case was disposed of on the grounds of mootness. *Id.* at 598. The Commission also cites dicta in *State ex rel. Missouri Pub. Serv. Comm'n v. Fraas,* 627 S.W.2d 882 (Mo. App.1981), that the choice of method to adjust the test year for known and measurable changes rests in the expert discretion of the administrative body and the court will not dictate the choice of method to the Commission. Although dicta, in cases otherwise found to be moot, the proposition is correct. These are factual determinations and, as such, within the expertise of the Commission.

The Commission does not, however, have unfettered discretion in making its determination; there are judicial limits. In *State ex rel. Lake Lotawana v. Public Serv. Comm'n,* 732 S.W.2d 191, 195 (Mo.App. 1987). For judicial review to have any bearing, there is a minimum requirement that the evidence, as explained by the witnesses and the Commission, make sense to the reviewing court. *Id.* On appeal, the court may not approve an order simply on faith in the Commission's expertise. *Id.*

GTE North cites *State ex rel. Missouri Power & Light Co. v. Public Serv. Comm'n,* 669 S.W.2d 941 (Mo.App.1984), in support of its contention that the Commission is compelled to incorporate known and measurable adjustments into the Separation Factors. In *State ex rel. Missouri Power & Light Co.,* the court considered rates set by the Commission for an electric utility. The Commission refused to include an allowance for tree trimming in the test year although the expense of tree trimming occurred in the test year and at least supported the use of a normalized five year average. *Id.* at 944–45. There were no tree trimming contracts in effect or in prospect at the time of the hearing, but the record reflected that the company intended to resume the use of contract tree trimming. *Id.* at 945. The court held that the tree trimming expense should have been included as it recognized "that the rate base is itself no more than an estimate, the fact that in a particular year there is no contract tree trimming expense is not alone a sufficient basis to disallow all costs for contract tree trimming from the projection of future expenses." *Id.*

*State ex rel. Missouri Power & Light Co.* was cited by GTE North for the proposition that the Commission abuses its discretion by failing to incorporate a known and measurable item into the Separation Factors. GTE North's conclusion is mistaken. The court did not hold that all matter known and measurable must be utilized as adjustments, but simply that under the circumstances of that case it was an abuse of discretion to exclude tree trimming expenses. It is not required by law that the Commission recognize and incorporate all such known and measurable events outside the test year so long as the approved Separation Factors result in rates which are just and reasonable. Section 392.200.1, RSMo Supp.1991.

The Commission's Report and Order relates why it refused to accept GTE North's Separation Factors. The Report states that, "Comparisons of the actual 1988 factors and the annualized factors through June, 1988, indicate that the factors filed in the Tariff Review Plan are more accurate than the Company's filing made in this case." GTE North's proposed Separation Factors included adjustments other than the Federal–State mandated changes, such as adjustments for inflation and growth in access lines. The Commission found these were based on unreliable evidence and should be rejected. Other proposed adjustments which favored GTE North were accepted by the Commission. The Report indicates that it was the decision of the Commission to use the inverse of the

factors relating to interstate jurisdiction as they logically represent the remaining factors relating to intrastate jurisdiction. Additional impetus to accept these factors was the fact that they were the inverse of the factors prepared by GTE North and submitted to the FCC for the purpose of FCC rate-making for GTE North's interstate operations. It is reasonable to infer that GTE North would be motivated in the preparation of such Tariff Review Plan to present a proposal favorable to GTE North. Therefore, the Separation Factors adopted by the Commission have added credibility.

The Commission further finds that "the Staff's method of determining separations is more reasonable than the Company's which includes projected data." There was substantial evidence before the Commission that the Staff compared its Separation Factors based on 1988 data to actual data for seven months of 1989. This comparison revealed that despite some increased expenses, such as the Federal–State mandated charges, there were offsetting increases in revenue such as a $262,000 increase in USF [6] revenues and a general growth in revenues. Although GTE North's evidence contradicted portions of the Staff's evidence, the Commission is the finder of fact, not the court; findings of fact by the Commission are presumed to be correct. *State ex rel. U.S. Water/Lexington v. Public Serv. Comm'n,* 795 S.W.2d 593 (Mo.App. 1990). Competent and substantial evidence supports a finding that the Separation Factors approved by the Commission result in just and reasonable rates which reasonably projected GTE North's future revenues and expenses. A court may not substitute its judgment where the Commission's order is supported by substantial and competent evidence. *Id.*

GTE North raises an additional argument that in *Re Staff of Missouri Pub. Serv. Comm'n v. Southwestern Bell Tel. Co.,* 104 P.U.R. 4th 381 (June 20, 1989), the Commission accepted the use of Separation Factors effective one day beyond the test year. The *Southwestern Bell* case was neither mentioned nor distinguished in the Commission's decision. GTE North claims the Commission's failure to follow its position in *Southwestern Bell* is arbitrary and capricious. This departure is by itself, however, not sufficient reason for a reversal of the Commission. The weight of the case law does not support GTE North's position.

An administrative agency is not bound by *stare decisis. State ex rel. Churchill Truck Lines, Inc. v. Public Serv. Comm'n,* 734 S.W.2d 586 (Mo.App.1987). "Courts are not concerned with alleged inconsistency between current and prior decisions of an administrative agency so long as the action taken is not otherwise arbitrary or unreasonable." *Columbia v. Missouri State Bd. of Mediation,* 605 S.W.2d 192, 195 (Mo.App.1980). It is the impact of the rate order which counts; the methodology is not significant. *State ex rel. Arkansas Power & Light Co. v. Public Serv. Comm'n,* 736 S.W.2d 457 (Mo.App.1987).

In *State ex rel. Arkansas Power & Light,* despite AP & L disputing the Commission's determination of its revenues, the court upheld the action of the Commission, stating that, "The mere fact AP & L's methodology would be more favorable to it than that chosen by the Commission will not alone, amount to reversible error." *Id.* at 461. The court further held:

> If the total effect of the rate order cannot be said to be unjust or unreasonable, judicial inquiry is at an end. No methodology being statutorily prescribed, and ratemaking being an inexact science, requiring use of different formulas, the Commission may use different approaches in different cases.

*Id.* at 462. (citations omitted).

The methodology used by the Commission in the instant case produced a rate order that cannot be said to be unjust or

---

**6.** The Universal Service Fund (USF) was established by the FCC to permit local exchange companies with significantly higher than average loop (the communications channel between the subscriber's location and the local central office) costs, to allocate more loop costs to the interstate jurisdiction. The USF is a high cost assistance program designed to recover a portion of the loop costs from the IXCs rather than from basic local users.

unreasonable. Its use of the inverse factors takes into account those factors that GTE North complains were omitted. Its method, although not identical in application as that applied in past cases, most notably *Southwestern Bell*, was uniquely tailored to the factors it encountered when using the data pertinent to the instant case. Mindful that the central purpose of the "test year" is as a predictor, it makes sense for the Commission to be allowed flexibility in order to establish that the best possible data be analyzed for its predictions to achieve a degree of accuracy. Comparison of the projections with the actual figures shows that this purpose has been achieved. In conclusion, this court holds that the Commission order is supported by competent and substantial evidence and is not arbitrary and capricious as the principles relating to the matching of income, revenue and expenses have been applied. Thus, the order of the Commission is affirmed.

## BILLING AND COLLECTIONS

■ GTE North proposed a decrease in its billing and collection charges of $320,181 for interLATA toll calls and $39,936 for intraLATA toll calls based upon its contract with AT & T. Since January 1, 1987, GTE North has had a contract with AT & T for billing and collection services for interstate traffic. GTE North proposed the decrease to reduce the intrastate charges to match the interstate charges also provided for in the contract. The Commission found that there was insufficient evidence on which to base the reduction that GTE North proposed, and that the issue had not been raised until the filing of GTE North's initial and reply briefs to the Commission.

The court below found that the Commission erred by failing to make findings of fact and conclusions of law upon the merits of the proposed reduction. The Commission contends that the circuit court's decision was in error and that it acted correctly because the Commission found that "there is insufficient evidence in the record on which to base the proposed reduction." It must be noted that contrary to the Commission's finding the contract in question was provided to the Commission in response to

Staff Data Request No. 733. There is also testimony in the record concerning the proposed reduction.

Thomas J. Kowalski testified for GTE North, proposing that intrastate billing and collection charges mirror interstate contract rates with AT & T in order "to maintain parity between interstate and state rates to the extent feasible." Staff witness James L. Edson testified in rebuttal. He opposed the proposed reduction stating that "they should not be approved in light of GTE North's request for a rate increase."

It must be reiterated that the review of an order of the Commission falling within its discretionary power looks to whether the action of the Commission was arbitrary or without reasonable basis. *Smith*, 351 S.W.2d at 771. The record supports the Commission's determination that there was not substantial evidence to support the proposed reduction, its error regarding the record on the contract notwithstanding. Mr. Kowalski and Mr. Edson made passing references to the AT & T contract. Mr. Kowalski's testimony dealt generally with the proposal and its mechanics. He claimed a need for parity without underlying evidence as to the nature of the services, the benefits from the existence of the AT & T contract or the effect of the proposed reduction on other rates. This does not constitute substantial evidence.

Under § 386.270, the billing and collection charges sought to be reduced by GTE North were *prima facie* lawful. GTE North had the burden of proof and failed to meet this burden. The portion of the Commission's Report and Order denying a reduction in Billing and Collection changes is affirmed.

## SWITCHED ACCESS SERVICE

■ In its Report and Order, the Commission rejected GTE North's proposal to reduce its intrastate interLATA CCLCs to bring parity between interLATA and intraLATA charges for both originating and terminating traffic. In its petition for a writ of review, MCI challenged the lawful-

ness of the Report and Order in that it failed to require GTE North to stop charging different rates for switched access service depending on whether MCI and the other interexchange telecommunications companies (IXCs) use the service to provide interLATA toll service or to provide intraLATA toll service. The circuit court agreed with the position taken by MCI, finding:

> The PSC's Report and Order is unlawful and unreasonable, because GTE North must charge MCI and other IXCs the same rates for switched access service regardless of whether MCI and other IXCs use that service to provide interLATA toll service or intraLATA toll service, in that GTE North provides exactly the same service under such circumstances. The PSC's Report and Order would unlawfully allow GTE North to continue to charge different rates for doing a like and contemporaneous telecommunications service under the same or substantially the same circumstances and conditions. Such discriminatory pricing is prohibited by Section 392.200.2 R.S.Mo. *See also State ex rel. DePaul Hospital v. PSC,* 464 S.W.2d 737, 739 (Mo.App.1970).

Within its service area in Missouri, GTE North has a monopoly over local exchange service. This includes exclusive control of local access connections to consumers. MCI and the other IXCs must use these connections to provide toll (long distance) services. They purchase intrastate switched access service from GTE North at both the originating and terminating ends of calls. At the time of the hearing, GTE North's originating CCLC was $.0403 per minute for interLATA traffic and $.0204 per minute for intraLATA traffic. The terminating CCLC was $.0692 per minute for interLATA traffic and $.0350 per minute for intraLATA traffic. GTE North uses the same facilities and plant and incurs the same costs in providing switched access service whether providing interLATA toll service or intraLATA toll service.

LATA's were established as a result of the antitrust litigation aimed at breaking up the monopoly established by AT & T in the telecommunications industry. Before the divestiture, local telephone service was provided by the Bell Operating Companies (BOCs) or by local independent companies. These Local Exchange Companies (LECs) provided the necessary connections for telephone calls within the geographic area served by the LEC. In order to make a connection outside that geographic area, the call would be picked up by an IXC and routed to the LEC area where the call was to terminate.

In *United States v. AT & T,* 552 F.Supp. 131 (D.D.C.1982), *aff'd sub nom. Maryland v. United States,* 460 U.S. 1001, 103 S.Ct. 1240, 75 L.Ed.2d 472 (1983), the court ordered AT & T to divest itself of its BOCs. The BOCs were forbidden to provide interexchange telecommunications services. *Id.* at 227. GTE North Operating Companies were thereafter barred from providing interexchange services. *United States v. GTE Corp.,* 603 F.Supp. 730 (D.D.C.1984). Local Access and Transport Areas (LATAs) were established providing boundaries, beyond which these operating companies could not venture. "[T]he purpose of the LATAs is only to delineate the areas in which the various telecommunications companies will operate; it is not to distinguish the area in which a telephone call will be 'local' from that in which it becomes a 'toll' or long distance call." *United States v. Western Elec. Co.,* 569 F.Supp. 990, 994–95 (D.D.C.1983).

MCI argues that charging different rates for switched access services, depending upon whether that service is purchased to provide interLATA toll service or intraLATA toll service, violates § 392.200.2, RSMo Supp.1991, which provides:

> No telecommunications company shall directly or indirectly or by any special rate, rebate, drawback or other device or method charge, demand, collect or receive from any person or corporation a greater or less compensation for any service rendered or to be rendered with respect to telecommunications or in connection therewith, except as authorized in this chapter, than it charges, demands, collects or receives from any other per-

son or corporation for doing a like and contemporaneous service with respect to telecommunications under the same or substantially the same circumstances and conditions.

The Commission notes that it is permissible for different classes of messages to be charged at different rates. Specifically, § 392.200.3, RSMo Supp.1991 provides, in pertinent part:

[T]elecommunications messages may be classified into such classes as are just and reasonable, and different rates may be charged for the different classes of messages.

Further reading of the statute shows that § 392.200.4, RSMo Supp.1991, is also applicable, providing:

No telecommunications company may define a telecommunications service as a different telecommunications service based on the geographic area or other market within which such telecommunications service is offered or provided, unless the telecommunications company makes application and files a tariff or tariffs which propose relief from this subsection. Any such tariff shall be subject to the provisions of sections 392.220 and 392.230 and in any hearing thereon the burden shall be on the telecommunications company to show, by clear and convincing evidence, that the definition of such service based on the geographic area or other market within which such service is offered is reasonably necessary to promote the public interest and the purposes and policies of this chapter. The commission, on its own motion or upon motion of the public counsel, may by order, after notice and hearing, define a telecommunications service offered or provided by a telecommunications company as a different telecommunications service dependent upon the geographic area or other market within which such telecommunications service is offered or provided and apply different service classifications to such service only upon a finding, based on clear and convincing evidence, that such different treatment is reasonably necessary to promote the

public interest and the purposes and policies of this chapter.

The Commission asserts on appeal that interLATA switched access and intraLATA switched access are two different classes of service and thus different rates may be charged pursuant to § 392.200.3, RSMo Supp.1991. The parties hotly contest this issue based upon their assumption that this was, in fact, what the Commission so found. The record, however, does not reflect such a finding. Although the Commission concludes that "[t]he infirmities are too great to accept the Company's proposal to achieve parity in access charges at the present time," the Commission never found that the services in question were not discriminatory or if they were, why such discrimination was justified and reasonable under § 392.200.3, RSMo Supp. 1991. The record is also devoid of whether there have been previous proceedings on this issue pursuant to § 392.200.3, RSMo Supp.1991, in prior GTE North rate settings. Although the Commission appears to be following § 392.200.4, RSMo Supp. 1991, in its discussion of how the new proposal would impact different classes of customers, it does not follow that section either procedurally, or in terms of rendering of "a finding, based on clear and convincing evidence, that such different treatment is necessary to promote the public interest and the purposes and policies of this chapter."

The question presented by the intraLATA/interLATA issue involves a factual determination. No factual determination was made by the Commission. This court cannot modify the Commission decision or properly make that finding for it. *See State ex rel. Railway Express Agency, Inc. v. Public Serv. Comm'n*, 237 Mo.App. 420, 169 S.W.2d 88, 91 (1943). The lack of such a finding makes meaningful review impossible. Because the Commission's order seemingly violates the provisions of § 392.200.2 through § 392.200.4, RSMo Supp.1991, by not making such findings as are necessary, the cause is reversed and remanded back to the Commission for further action.

The Report and Order of the Commission is affirmed in part; reversed as to that portion pertaining to the IntraLATA/Inter-

LATA switched access charges and remanded for further proceedings. In addition, the stay issued by this court is quashed.

All concur.

## ON MOTIONS FOR REHEARING OR TRANSFER

PER CURIAM.

GTE North and MCI have both filed motions for rehearing or transfer claiming that the opinion is in conflict with *State ex rel. Southwestern Bell Tel. Co. v. Brown,* 795 S.W.2d 385 (Mo. banc 1990). They claim that the opinion established a three-tier appeal and held that a circuit court's reversal of a Commission order is not a judgment, both in violation of *Brown.* This is a misreading of the opinion and of *Brown.*

The opinion refers to a three-tiered review. Nothing in this description of the process by which the Commission's order is reviewed violates *Brown,* which distinguishes a writ of review from an appeal finding it to be a separate and distinct action. *Brown,* 795 S.W.2d at 388. The *Brown* court described the writ of review as being "in the nature of an appellate process." *Id.* (quoting 14 Am.Jur.2d, Certiorari § 2 (1964)). The opinion is, therefore, fully consistent with *Brown* in its description of the process. It does not refer to the circuit court procedure as an appeal but quite clearly describes the review process.

The opinion also describes the judgment of reversal by the circuit court as not a final judgment in the traditional sense because it is not available for execution. This interpretation does not conflict with *Brown.* The movants focus on the statement in *State ex rel. Southwestern Bell v. Brown* that "review permitted under § 386.510 is a separate action, and for purposes of procedural analysis, not an appeal." Movants argue that this is a determination by the Supreme Court that the decision of the circuit court regarding a Public Service Commission case has the same effect as any other judgment of the circuit court, thus this court's reasoning to the contrary is in error.

In context, the quoted passage from *Southwestern Bell v. Brown* concerns whether a trial court retains jurisdiction over a stay it issued under § 386.520, RSMo 1986, in conjunction with an application for a writ of certiorari or review, following a dismissal with prejudice of that writ. The trial court retained jurisdiction to dispose of monies collected during the pendency of the appeal. The Supreme Court addressed the applicability of Supreme Court Rules pertaining to appeals and to judgments. It did not address whether the circuit court's decision is a judgment available for execution.

The judgment of reversal in the instant case is not the same as a traditional circuit court judgment capable of being executed on by the prevailing party. The review of the Commission's decision by the circuit court is done within the narrow confines of administrative procedure. Upon the circuit court deciding that the Commission has erred, it cannot take it upon itself to correct that error. Instead, a remand to the Commission for further action is the only appropriate disposition the circuit court is allowed to make once it determines that reversal is proper.

The instant case is illustrative of the consequences of determining a circuit court judgment of reversal is available for execution where such judgment ignored the prohibition against judicial ratemaking. First, the proposition set forth in the motions for rehearing, if followed, would lead to an unwieldy and unworkable system of parallel appeals. It would also undermine the stability of the ratemaking process, allowing rate changes to be effected at each level of review. Finally, and most importantly, this court has found that the circuit court erred in its handling of this review. The very rates that movants wish to execute upon have been found to be beyond the authority of the circuit court. The futility of such execution is obvious.

Other matters raised in the Motions are sufficiently addressed in the opinion of this

court. GTE North's and MCI's motions for rehearing are overruled and their motions to transfer are denied.