STATE of Missouri ex rel. MISSOURI POWER AND LIGHT COMPANY, Appellant,

v.

PUBLIC SERVICE COMMISSION OF the STATE OF MISSOURI, Respondent.

No. WD 34814.

Missouri Court of Appeals, Western District.

Feb. 21, 1984.

As Modified April 18, 1984.

---

Gary W. Duffy, Hawkins, Brydon & Swearengen, P.C., Jefferson City, for appellant.

Eric Kendall Banks, Asst. Gen. Counsel, Mo. Public Service Com'n, Jefferson City, for respondent.

Before MANFORD, P.J., and CLARK and KENNEDY, JJ.

CLARK, Judge.

This is an electric utility rate case presenting issues as to exclusion from or inclusion in the rate base of an investment in a distribution line extension and certain items of expense all as related to a fair rate of return. The circuit court affirmed the rate schedules allowed by the Missouri Public Service Commission and the company appeals. Reversed.

The case commenced in January, 1982 when the utility filed a revised rate tariff. Implementation of the rate increase was suspended by order of the commission and the case was heard by the commission in August, 1982. After a decision was rendered in October, 1982, the utility pursued a writ of review in the circuit court. This appeal followed the circuit court judgment in April, 1983.

The rate base and expense issues, contract distribution tree trimming and distribution line extension, are factually unrelated and the points as to each will be separately treated. As to each, however, the utility contends the commission order lacks evidentiary support and is contrary to controlling law.

## CONTRACT TREE TRIMMING

The utility's distribution lines in residential and business districts frequently are located near tree branches which, when they contact the lines, cause service interruptions. Maintenance of service requires a regular program of trimming tree growth. Experience has shown that arranging for tree trimming through outside contractors is more economical than using the utility's line crews and the commission has encouraged the practice.

In the case of Missouri Power and Light, the expense for tree trimming has varied. In 1980, the cost was $253,000.00 and in 1979, it was $295,000.00. From the year 1975 to 1978, the lowest expenditure was $35,000.00 and the highest was $133,000.00. In connection with the previous Missouri Power and Light case, ER–80–286, the commission determined that a five year average, adjusted by the Consumer Price Index, should be used as allowable tree trimming expense in the test year to normalize fluctuations in tree trimming costs from year to year. Although actual expense incurred by the utility for tree trimming in 1981 was ultimately incurred in the amount of $340,-000.00, use of the five year average in the 1980 rate case resulted in an allowance of $182,250.00.

The test year in the present case consisted of the twelve month period ending March 31, 1982. The purpose of the test year is to establish a reasonably expected level of earnings and expenses. Data for the test year was enlarged by known and measurable changes through June 30, 1982. As to tree trimming expense, a portion of the 1981 calendar year expense noted

above was incurred in the test year and such costs continued in the first three months of 1982.

By reason of the updating of information to June 1, 1982, it was determined that the utility had cancelled some contract distribution tree trimming. This was explained as being attributable to the depressed economy, fewer housing starts and very little new commercial or industrial activity. While tree trimming continued to be necessary work to maintain service, the utility decided to use its own line employees who were otherwise underutilized in performing normal service connection work. Utility witnesses expressed the opinion that when the economy improved, they would return to their contract suppliers for tree trimming service. There was no predictable date when this would occur.

The commission in its order determined that all contracts by the utility for tree trimming by outside firms had ceased as of August 31, 1982 and the utility had no tree trimming contracts for the remainder of 1982 or for 1983. On this account, the commission ruled that no allowance would be made in the test year for tree trimming. The utility argued then and now for inclusion of $180,788.00 in tree trimming expense computed on the five year average adopted in principle in the 1980 rate case.

■■■ The role of the court on appeal from a report and order of the Public Service Commission is to determine whether the report and order are lawful and reasonable and, in this review, the commission order has a presumption of validity. *State ex rel. Utility Consumers Council v. Public Service Commission*, 585 S.W.2d 41, 47 (Mo. banc 1979). While the court may not substitute its judgment for that of the commission, it can determine whether the commission could reasonably have reached the result on the consideration of all the evidence before it. *State ex rel. Oliver v. Public Service Commission*, 542 S.W.2d 595, 598 (Mo.App.1976). On review of the decision of the commission, reversal of the order is warranted if it appears that the action of the commission was arbitrary, capricious and without reasonable basis. *State ex rel. Fee Fee Trunk Sewer, Inc. v. Public Service Commission*, 550 S.W.2d 945, 946 (Mo.App.1977).

The facts applicable to the category of tree trimming expense, amplified by the record in the prior rate case for this utility, are not the subject of any contest. In the earlier case, when the data base showed increasing expense for distribution contract tree trimming, the commission adopted the concept of a normalized average of five years expense, the net effect of which was to disallow the utility a portion of tree trimming cost actually incurred and expended in the test year. The basis and justification for normalization is that rise and fall of fluctuating expenses will project a reasonable allowance in determining a rate producing a fair return in future years.

There was no dispute in the present case that for the test year ending March 31, 1982, the utility had incurred substantial distribution contract trimming expense approximating the five year average allowance granted in the prior rate case. There is thus no factual basis to sustain disallowance of all tree trimming expense if the test year data and the five year average concept are the appropriate factors to consider in reaching the decision.

The commission order, however, bottoms its ruling on the fact, again not disputed, that the utility had suspended utilization of contract tree trimming pending improvement in the economy. In the language of the order, "The proposed allowance for distribution tree trimming is improper because there are no outstanding contracts for such services and there are no reasonably foreseeable circumstances under which such contracts will be expected." This approach amounts to a repudiation of the normalization by average concept, applied in the prior rate case to the disadvantage of the utility when costs were rising.

The report and order announces a commonly accepted principle of utility rate making. The test year is a period past, but is employed as a vehicle upon which to project experience in a future period when the rates determined in the case will be in effect. Normalization of a test year cost by multi-year averaging of the cost based on experience assumes that the cost rises and falls, with the consequence that the actual cost incurred in the test year is not representative. A decrease in the cost for a particular year does not warrant abandonment of the concept, but instead validates the assumption that the cost does not follow a level course. The decrease is factored into the projection in the mathematics of averaging. If the assumptions are correct, the test year then becomes representative by using the multi-year average in place of the actual test year expenditure. In theory, there is no reason why zero costs in some of the spread years may not be included in calculating the normalized cost.

The order in this case abandons the cost average approach to the expense for tree trimming at a time when the decline in these expenses makes the average approach more favorable to the utility in computation of the rate base. Were this expense item merely to have decreased, there would be no tenable ground to support the order excluding this category of expense from the test year in which tree trimming expenses were in fact incurred. The cancellation of the tree trimming contracts and the absence of current contracts for future service are therefore the only facts in the case which arguably support the commission decision.

The evidence in the case was that Missouri Power and Light had incurred tree trimming expense for the services of outside contractors each year from 1975 to 1982 and that the practice of using contract labor had been approved and advocated by the commission. Such expense incurred in the test year was substantial and at least supported the normalized five year average of $180,788.00. It is true that at the date of the commission hearing, there were no tree trimming contracts in effect or in prospect. The suspension of use of contract tree trimmers and the use of utility line crews to perform the task were, however, temporary cost conservation measures intended to retain in the company's employ the skilled force needed for more sophisticated work when business improved. The commission decision to disallow all contract tree trimming expense assumes, contrary to the evidence that no such expense will be incurred in future years. The record shows the intention of the company to resume use of contract tree trimming and no purpose to assign this work permanently to regular company employees.

■ In the face of this evidence, we conclude that the decision by the commission to disallow contract distribution tree trimming expense was without any reasonable basis in the evidence and was arbitrary. By the factoring process, inherent in the normalization concept, an appropriate adjustment is made for those years in which this expense item declines or is not incurred. Recognizing that the rate base is itself no more than an estimate, the fact that in a particular year there is no contract tree trimming expense is not alone a sufficient basis to disallow all costs for contract tree trimming from the projection of future expenses. Tree trimming work is regularly needed to maintain service and the suspension of contracts for the work was a temporary condition. By continued use of the five year cost average, including as a divisor those years in which no contract expense was incurred, the expense projection will continue to be normalized by actual experience.

The tree trimming expense item advocated by Missouri Power and Light should have been included by the commission as an expense allowable to compute rates for service.

## DISTRIBUTION LINE EXTENSION

In 1979, Missouri Power and Light constructed a distribution line extension of 1.8

miles at a cost of $48,690.00. The request for service which prompted the construction was from an employee of the company who owned property in the area and who received electric service as a result of the line extension. By the date of hearing before the commission in this case, the line extension served five customers, including the company employee. During the test year, revenues from the line extension amounted to $2930.00 and expenses were $3479.00.

The area where the line extension was built also has service available from an existing Rural Electric Cooperative (REC), and to some extent the distribution line erected by Missouri Power and Light was duplicative of REC lines. The five customers of Missouri Power and Light, however, had not previously been connected to the REC service, but were new customers for electric service in the area.

At the time the distribution line extension was authorized by the utility's management, there was some expectation of subdivision development in the area, but no existing unfilled need for service. Experience since the line was built has not confirmed expectations for home construction and the capacity of the line in terms of numbers of customers who could be served is underutilized. The commission order eliminated the utility's investment in the line extension for computation of the rate base and also excluded revenues and expenses associated with the line.

We first note that the commission decision rests in part on an adverse inference drawn from the uncontested fact that the service request was made by a company employee. In the words of the commission order: "In the Commission's opinion the evidence in this matter establishes that the primary motive for construction of the line in question was to respond to a request for service from the Company's vice-president."

■ All other factors being equal, the identity of the service applicant as a vice-president of Missouri Power and Light is irrelevant to the issue in this case. Section 393.130, RSMo 1978 obligates every electrical corporation in the state to provide service instrumentalities and facilities which are adequate. The certificate of convenience and necessity issued to the utility is a mandate to serve the area covered and it is the utility's duty, within reasonable limitations, to serve all persons in an area it has undertaken to serve. *State v. Public Service Commission,* 343 S.W.2d 177, 181 (Mo.App.1960). The obligation of the utility to provide service is neither enhanced nor reduced by reason of the fact that a customer is also a company employee.

Apart from the implication of some impropriety in the line extension for service to the company employee, the commission relied on three other grounds as the basis for denying inclusion of the line in the rate base computation. These were unfulfilled need for service at the time the line was built, revenue production from electric service on the line and duplication of REC facilities. The first two grounds are essentially economic in focus and may be considered conjunctively.

■ In the field of utility rate making, two historic approaches have been taken to including or excluding property in the rate base where the property is not currently used to provide the service paid for by the rate, the used and useful theory and the prudent management theory. Colton, **Excess Capacity: Who Gets The Charge From The Power Plant?** 34 *Hastings Law Journal,* **1133** (1983). Under the used and useful theory, the company is allowed to charge customers only for the cost of plant and equipment actually in use to provide service for current customers. Excess plant is disallowed. Under the prudent management theory, excess plant is included in the rate base, even though not currently utilized if in forecasting future needs company management has made a prudent construction decision. In the present case, Missouri Power and Light

argues that the distribution line extension is includable under either theory.

It is undisputed that the line in question does serve customers but does not generate sufficient revenue to defray the costs of service prorated to the extension on a pole/mile basis. This is the substance of the unfulfilled need referred to in the commission report and is demonstrated by the gap between revenues and cost of service. If the line is included in the rate base, then all rate payers will share in defraying the cost of the line not returned in direct revenues.

■ The line extension cannot be excluded from the rate base under the used and useful theory because customers are served by the line and there was no evidence before the commission that any portion of the line was surplus in terms of providing service to the customers who were connected. This is unlike the situation in *St. Joseph Stockyards Co. v. United States*, 11 F.Supp. 322 (W.D.Mo.1935) where land held for expansion of the yards was not currently in use at all.

■ By considering the cost versus revenue test as a ground to exclude a distribution line actually in service, the commission inferentially has held that each segment of the company's lines must be cost effective or the line will be deemed unjustified. The commission cites no authority for use of this approach in utility ratemaking and independent research has disclosed none. To the contrary, common experience suggests that a decision to expand service facilities usually involves a forecast of future needs of customers and that line extensions are seldom fully utilized upon the completion of construction. The cost effective test is therefore not an independent basis upon which to deny inclusion of plant and equipment investment, but is a factor to consider in determining whether a prudent management decision was made. Apart from that aspect of the case, the revenue shortfall does not support disallowance of costs attributable to the line extension because the line is admittedly used and useful in serving customers.

The issue appropriately posed by the economic facts of the line extension is whether the decision by the company to construct the line was reasonably justified at the time that decision was made. The commission took the view that the lack of a significant number of customers awaiting service and the failure in later development of customer potential demonstrate an imprudent management decision. The company argues that subdivision development was expected when the line was built and it was only the unforeseen recession in 1981 and 1982 which delayed realization of the added customers the line was expected to serve.

The only evidence tending to support the commission's disallowance of the line extension, apart from the inference drawn by reason of service furnished to the company employee, was the differential between revenues and the cost of service and the testimony by a commission staff member that there was no growth potential in the area when the decision to build the line was made. The staff member offered no facts to support that opinion, apart from the advantage of hindsight, and admittedly made the evaluation of growth potential a year or more in retrospect. Even accepting a valid difference of opinion on the estimates for future service demands, there was no evidence that the decision to build the line constituted mismanagement at the time or that the subsequent recession could reasonably have been anticipated.

■ Where the Public Service Commission in setting rates reviews management decisions by the utility in operating its business, the prudent management theory focuses on the decision making process by management and not on the results of the decision. This follows for the reason that prediction of consumer demand is uncertain, the utility is obligated to furnish ser-

vice to the public within reasonable limits and results are available only after the decision in question has been made. If the company has exercised prudence in reaching a decision, the fact that external factors outside the company's control later produce an adverse result do not make the decision extravagant or imprudent. In the landmark case of *Wisconsin Telephone Company v. Public Service Commission*, 232 Wis. 274, 287 N.W. 122 (1939), a case which dealt with the consequences upon the company's plant of the 1930's depression, the court stated the limits upon commission re-management of the utility in the following language applicable to the present case:

"In making its determination in this case the Commission substituted the discretion of the witness (commission staff) for that of the managers of the property without in any way impeaching the discretion of the managers. It is much easier to point out past errors in management than it is to avoid future mistakes. A reasonable rate is one based on reason as applied to the property of the utility. While the Company must bear the burden of an unreasonable extension of its plant and the risk that portions of it prudently acquired may become obsolete or not useful, it should not be penalized for failure exactly to anticipate future demands for service in a period of depression."

*Wisconsin Telephone Co. v. Public Service Commission, supra,* 287 N.W. at page 158.

■ There was no evidence in this case that subdivision development in the area of the line extension was not a reasonable anticipation in 1979 or that the economic recession of the following two years was to be foreseen. The fact that five customers are now served by the line establishes the line as used and useful in transmitting electric power and also forecloses any contention that the line is extravagant because built to serve only the customer who requested service. There was no evidentiary support for a conclusion that the distribution line extension should have been excluded from the rate base because not used and useful or as the product of an imprudent management decision.

The commission report and order also placed substantial reliance for exclusion of the distribution line extension on the fact that customers drawing service from the line could equally well have applied to and received electric service from the REC in the area. In the language of the report: "To extend service, at a loss, into an area where service does not exist may be justified. Such justification does not exist for the competition and acquisition of the customers, at a loss, when service exists from another source."

■ It is true that experience showed a loss on the line extension, but the foregoing assumes the decision to build the line was made in expectation of a loss. There was no evidence to this effect. To the contrary, as discussed earlier in this opinion, the evidence was that subdivision development in the area was expected. The question is whether the potential for service to new customers from a rural electric cooperative precludes the franchised investor owned utility from constructing lines to acquire those customers.

In *Missouri Utilities Company v. Scott-New Madrid-Mississippi Electric Cooperative*, 475 S.W.2d 25 (Mo. banc 1971), the court was presented with the reverse of the question, that is, whether the franchised utility could bar the cooperative from extending service to a new customer in the territory allotted to the franchised utility. The court held that it could not indicating that the franchise granted to the electric cooperative by statute, § 394.080, RSMo 1978, in effect creates an entitlement to competition and an opportunity for customers to choose which service they desire. It must also follow that in any rural area, such as was involved in the line extension

here, the private utility suffers no impediment to extension of its facilities and the solicitation of new customers merely because an electric cooperative has lines available for service connections in the same area.

The commission decision to exclude the distribution line extension from the rate base of Missouri Power and Light was not based on substantial evidence and incorrectly applied the law.

Accordingly, the judgment affirming the Report and Order of the Public Service Commission of October 29, 1982 is reversed and the cause is remanded for further proceedings consistent with this opinion.

All concur.