

# MISSOURI COURT OF APPEALS
## WESTERN DISTRICT

| | | |
|---|---|---|
| IN THE MATTER OF THE PETITION OF THE EMPIRE DISTRICT ELECTRIC COMPANY d/b/a LIBERTY TO OBTAIN A FINANCING ORDER THAT AUTHORIZES THE ISSUANCE OF SECURITIZED UTILITY TARIFF BONDS FOR QUALIFIED EXTRAORDINARY COSTS AND IN THE MATTER OF THE PETITION OF THE EMPIRE DISTRICT ELECTRIC COMPANY d/b/a LIBERTY TO OBTAIN A FINANCING ORDER THAT AUTHORIZES THE ISSUANCE OF SECURITIZED UTILITY TARIFF BONDS FOR ENERGY TRANSITION COSTS RELATED TO THE ASBURY PLANT; EMPIRE DISTRICT ELECTRIC COMPANY d/b/a LIBERTY, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| | ) ) | WD85800 Consolidated with WD85801 |
| Appellant-Respondent, | ) ) | |
| OFFICE OF PUBLIC COUNSEL, | ) ) | Filed: August 1, 2023 |
| Respondent-Appellant, | ) ) | |
| v. | ) ) ) | |
| PUBLIC SERVICE COMMISSION OF THE STATE OF MISSOURI, | ) ) ) | |
| Respondent. | ) | |

**APPEAL FROM THE PUBLIC SERVICE COMMISSION**

**BEFORE DIVISION ONE: ANTHONY REX GABBERT, PRESIDING JUDGE, LISA WHITE HARDWICK, JUDGE, AND MARK D. PFEIFFER, JUDGE**

The Empire District Electric Company, d/b/a Liberty ("Liberty"), appeals from the Amended Report and Order of the Public Service Commission ("Commission") approving the securitization of costs in an amount less than Liberty requested. In Points I and III, Liberty contends the Commission's calculation of the amount of energy transition costs for a retired plant that Liberty could recover through securitization violates the securitization statute, is not supported by substantial evidence, and is unreasonable. In Point II, Liberty asserts the Commission erroneously imposed a blanket reduction on the amount of fuel and power purchase costs in connection with a winter storm that Liberty could recover through securitization. For reasons explained herein, we affirm.

## FACTUAL AND PROCEDURAL HISTORY

Formerly known as Empire, Liberty is an electrical corporation and public utility regulated by the Commission. Liberty generates, purchases, distributes, and sells electricity in portions of Missouri, Arkansas, Kansas, and Oklahoma. Liberty's customers include residents of 16 counties in southwest Missouri.

### Asbury Coal Plant Retirement

In 1970, Liberty built Asbury, a 200-megawatt coal plant, located in Asbury, Missouri. Between 1970 and 2008, Liberty invested about $113 million to build and maintain Asbury. In 2008, Liberty installed a $33 million selective catalytic reduction system to reduce Asbury's nitrogen oxide emissions. In 2014, Liberty retrofitted Asbury

with a $141 million Air Quality Control System to comply with federal environmental regulations. Liberty represented that these upgrades would extend Asbury's operational life through 2035.

Liberty participates in the Southwest Power Pool's ("SPP") wholesale electricity market. Between 2010 and 2019, Asbury's position in the SPP worsened, primarily due to decreasing natural gas prices and the declining cost and increasing use of wind resources. These market forces rendered Asbury uneconomic for Liberty to run most of the time. In the past decade, a third of the United States coal fleet retired under such market pressure. Asbury's last day of generating power was December 12, 2019, when its coal supply was exhausted. Asbury was officially retired on March 1, 2020, after Liberty notified the SPP of the planned retirement, and the plant was decommissioned and dismantled.

For tax purposes, Liberty wrote off Asbury. Liberty claimed Asbury's remaining accelerated depreciation as abandonment loss deductions in 2019 and 2020. Liberty received a $16.5 million tax benefit on the deductions. For ratemaking purposes, Liberty abandoned Asbury during a 2019 general rate case, Commission Case No. ER-2019-0374 ("2019 rate case"). The rates established in the 2019 rate case included the costs associated with operating Asbury. At that time, all the financial impacts of the abandonment could not be ascertained.

The parties in the 2019 rate case agreed the Commission should establish an Accounting Authority Order ("AAO") for Asbury. An AAO is a form of Commission-approved deferral accounting in which specific costs are recorded as regulatory assets, for

3

possible recovery from customers, or regulatory liabilities, for possible credit to customers, and held for final Commission determination in a future rate proceeding. The Asbury AAO established a regulatory liability for various rate base and expense components, like rate of return on the Asbury plant, depreciation expense, operating and maintenance expenses, and property taxes. At the same time, Liberty established a regulatory asset that included Asbury's remaining book depreciation, plus other retirement costs.

The Commission set a 6.77% rate of return for Liberty in the 2019 case. This represented Liberty's weighted average cost of capital ("WACC"). Liberty's 2019 rates included this rate of return applied to Liberty's rate base, including Asbury.

Asbury was not included in the rates established in Liberty's next rate case, Commission Case No. ER-2021-0312 ("2021 rate case"). Initially, Liberty had requested final rate treatment of the Asbury AAO in the 2021 rate case. Liberty had sought recovery of all of its Asbury costs, including a full return on the retired plant. Commission Staff ("Staff") recommended a sharing of the responsibility for Asbury's unrecovered capital costs as of its retirement date between Liberty's shareholders and customers. Later in the 2021 rate case, however, Liberty abandoned its request for rate treatment of the Asbury AAO and decided to seek rate treatment for Asbury through securitization in the present case.

*Winter Storm Uri*

Between February 13 and 20, 2021, three severe winter storms collectively known as Winter Storm Uri struck portions of the United States. Much of the Midwest,

including Liberty's service area, experienced unseasonably cold temperatures, resulting in rolling electrical blackouts and extreme natural gas spikes. The SPP's grid nearly collapsed. Wholesale electricity prices surged. The SPP's on-peak day-ahead locational marginal prices for February 15 through 19, 2021, averaged 11,280% higher than the five-year average for the period, reaching $3,821.05 per megawatt hour for February 18, 2021 delivery. Liberty incurred approximately $193 million in extraordinary fuel and purchased power costs to serve its Missouri customers during the storm. Recovery of Liberty's $193 million in extraordinary fuel costs arising from Winter Storm Uri under the six-month recovery period established in Liberty's Fuel Adjustment Charge ("FAC") would create extreme customer rate impacts.[1]

*Securitization*

In 2021, the legislature authorized securitization, a financing technique, for the first time in Missouri when it enacted Section 393.1700.[2] Section 393.1700 allows utilities to petition the Commission for a financing order approving recovery of energy transition costs or qualified extraordinary costs through securitization. Energy transition costs relate to the retirement or abandonment of a power plant. § 393.1700.1(7). The statute defines these costs as "accrued carrying charges" and other costs "with respect to a retired or abandoned or to be retired or abandoned electric generating facility . . . where such early retirement or abandonment is deemed reasonable and prudent by the

---

[1] The FAC is a ratemaking mechanism in Liberty's tariff that allows the company to recover costs through a volumetric charge that appears on customer bills.

[2] All statutory references are to the Revised Statutes of Missouri 2016, as updated by the 2022 Cumulative Supplement.

commission." § 393.1700.1(7)(a). Qualified extraordinary costs relate to extreme events such as severe storms. The statute defines those costs as "prudently" incurred costs "of an extraordinary nature which would cause extreme customer rate impacts if reflected in retail customer rates recovered through customary ratemaking, such as but not limited to those related to purchases of fuel or power, inclusive of carrying charges during anomalous weather events." § 393.1700.1(13).

A financing order permitting securitization allows a utility to create a legally isolated, bankruptcy-remote special purpose entity. The special purpose entity issues bonds backed primarily by a statutory and regulatory right to receive a charge, referred to as a "securitized utility tariff charge," to be paid by the utility's customers. The utility creates and sells the right to receive the securitized utility tariff charge to the special purpose entity. The special purpose entity pays the utility for the right to impose, bill, and receive the securitized utility tariff charges by issuing bonds, thereby acquiring all of the utility's right to collect the securitized utility tariff charges from the utility's ratepayers. The right to receive revenues from the securitized utility tariff charges is called "securitized utility tariff property." The utility uses the proceeds from the sale of the securitized utility tariff property to recover the energy transition costs and/or qualified extraordinary costs.

The goal of securitization is to structure the securities in a way that will allow them to achieve the highest bond rating possible. That allows the issuer to set the price for those bonds at the lowest interest rate possible, thus saving customers money when compared to the amount they would have to pay if a traditional method of financing, at a

higher interest rate, were used.  Because the bonds are backed by a regulatory right to collect the securitized utility tariff charge from customers and are not dependent on the utility's credit, investors see the bonds as low risk, and they carry a lower interest rate than debt issued by the utility.

The cash the utility immediately receives in exchange for the securitized utility tariff property is not taxable.  The securitized utility tariff charges paid by customers over the life of the bonds are treated as gross income to the utility, recognized under the utility's usual method of accounting.  The utility is taxed on this gross income.  Section 393.1700.1(8) includes various taxes within the definition of "financing costs," which may be recovered through the securitized utility tariff charge.  Section 393.1700.2(3)(c)e requires the Commission to include a "true-up mechanism" to make periodic adjustments in the securitized utility tariff charges necessary to ensure the timely payment of the securitized utility tariff bonds, financing costs, and other required amounts.

***Liberty Seeks Securitization of Winter Storm Uri and Asbury Retirement Costs***

In January 2022, Liberty filed a petition seeking a financing order to securitize $221,645,532 in qualified extraordinary costs that it incurred in connection with Winter Storm Uri.  Liberty alleged that the use of securitized utility tariff bonds would result in $42,871,488 in quantifiable benefits to customers as compared to traditional ratemaking.

In March 2022, Liberty filed a second petition seeking a financing order to securitize $140,774,376 in energy transition costs related to Asbury's retirement.  Liberty alleged that the use of securitized utility tariff bonds would result in $32,051,938 in quantifiable benefits to customers as compared to traditional ratemaking.  The

Commission ordered Liberty's two petitions consolidated. Together, the petitions requested the approval to securitize approximately $362 million in costs.

Liberty filed supporting testimony. In its responsive testimony, Staff agreed that Liberty should recover costs for Winter Storm Uri and Asbury through securitization but proposed some adjustments to Liberty's amounts. Specifically, Staff proposed Liberty should recover $193.4 million for costs related to Winter Storm Uri and $68.9 million for costs related to Asbury's retirement, for a total of $262 million.

The Commission held an evidentiary hearing and issued a Report and Order in August 2022. The parties sought rehearing and clarification. After reviewing the filings, the Commission issued an Amended Report and Order in September 2022. In its Amended Report and Order, the Commission authorized Liberty to recover, through securitization, qualified extraordinary costs related to Winter Storm Uri in the amount of $199,561,572, energy transition costs related to Asbury's retirement in the amount of $82,921,331, plus $7.9 million in estimated upfront financing costs, for a total of $290,382,902. This amount was approximately $72 million less than the amount Liberty had requested to securitize. Liberty appeals.[3]

---

[3] The Office of Public Counsel ("OPC") has filed a motion to dismiss Liberty's appeal as untimely. Section 386.510 requires a notice of appeal to be filed within 30 days of the Commission's denial of an application for rehearing. The OPC argues that the Commission implicitly denied Liberty's application for rehearing of the original Report and Order by entering the Amended Report and Order, thereby making Liberty's notice of appeal due on November 1, 2022, 30 days from the October 2, 2022, effective date of the Amended Report and Order. The OPC cites no relevant authority for the proposition that the Commission's issuance of an Amended Report and Order "implicitly" denies applications for rehearing. The primary case the OPC relies on, *State ex rel. Kansas City, Independence & Fairmount Stage Lines Co. v. Pub. Serv. Comm'n*, 63 S.W.2d 88, 93 (Mo. 1933), is inapposite because the Commission in that case *explicitly* denied the application

Appellate review of the Commission's order is limited to determining whether the order is lawful and reasonable. *State ex rel. MoGas Pipeline, LLC v. Pub. Serv. Comm'n*, 366 S.W.3d 493, 495-96 (Mo. banc 2012). An order is lawful if the Commission acted within its statutory authority. *State ex rel. Sprint Mo., Inc. v. Pub. Serv. Comm'n*, 165 S.W.3d 160, 164 (Mo. banc 2005). "All questions of law, including whether statutory authority exists to support an order of the [Commission], are reviewed *de novo*." *In re Amendment of Comm'n Rule Regarding Applications for Certificates of Convenience & Necessity*, 618 S.W.3d 520, 523 (Mo. banc 2021). An order is reasonable if it is supported by substantial, competent evidence on the entire record, it is not arbitrary or capricious, and the Commission has not abused its discretion. *State ex rel. Praxair, Inc. v. Pub. Serv. Comm'n*, 344 S.W.3d 178, 184 (Mo. banc 2011). "The [Commission]'s orders are presumed to be valid, and the burden is on those challenging the orders to prove their invalidity." *In re Amendment of Comm'n Rule*, 618 S.W.3d at 523.

"All factual findings of the Commission are presumed correct, and if substantial evidence supports either of two conflicting factual conclusions, the Court is bound by the

for rehearing before it entered a supplemental order that in no way affected the party seeking judicial review; therefore, the Supreme Court held that the denial of the application for rehearing of the original Report and Order triggered the 30-day time limit for that party to file its request for judicial review. Here, the Commission's Amended Report and Order did not implicitly or explicitly deny Liberty's motion for rehearing, it made a substantive change to the original Report and Order that affected Liberty, and it advised the parties that they could file new or renewed applications for rehearing of the Amended Report and Order. The parties did so. The Commission's denial of those new applications for rehearing on October 12, 2022, triggered the 30-day time limit to file the notice of appeal. Liberty's notice of appeal was timely filed on November 10, 2022. The OPC's motion to dismiss the appeal is denied.

findings of the administrative tribunal." *Spire Mo., Inc. v. Mo. Pub. Serv. Comm'n,* 607 S.W.3d 759, 765 (Mo. App. 2020) (citation omitted). We defer to the Commission's determination of the witnesses' credibility, and "it is only where a Commission order is clearly contrary to the overwhelming weight of the evidence that we may set it aside." *Id.* (citation omitted).

"Additionally, with regard to issues within the Commission's expertise, we will not substitute our judgment for that of the Commission." *Id.* (citation omitted). Indeed, as the Supreme Court has stated:

> Missouri courts have long recognized that when the decision involves the exercise of regulatory discretion, the PSC is delegated a large amount of discretion, and "many of its decisions necessarily rest largely in the exercise of a sound judgment." "Under these circumstances, the reviewing court will not substitute its judgment for that of the [Commission] on issues within the realm of the agency's expertise."

*Sprint*, 165 S.W.3d at 164 (citations omitted). Applying this principle, we noted in *Spire* that "[t]his deference is applicable to decisions involving the establishment of utility rates . . . due to the inherent complexities involved in the rate setting process." 607 S.W.3d at 770 (internal quotation marks and citations omitted). We explained that "Missouri courts long have recognized that ratemaking is not an exact science, no methodology is statutorily prescribed or limited, and the complexities inherent in a rate-of-return determination necessarily require that the [Commission] be granted considerable discretion." *Id.* (internal quotation and citation omitted).

ANALYSIS

*Calculation of the Accumulated Deferred Income Tax Credit*

In Point I, Liberty contends the Commission erroneously calculated the amount of energy transition costs related to Asbury's retirement to be securitized because it violated Section 393.1700 in its calculation of the customer credit for accumulated deferred income taxes ("ADIT"). Liberty also asserts the Commission's calculation is not supported by competent and substantial evidence in the whole record, and is arbitrary, unreasonable, and an abuse of discretion.

ADIT results from accelerated depreciation, a tax break that allows companies to deduct large amounts of depreciation expenses from taxable income in the early years of an asset's life. For ratemaking purposes, a utility collects an allowance for income tax expenses in its general rates that assumes deductions based on the book, *i.e.,* straight-line, depreciation method, which depreciates plant items at a uniform rate. Early in the life of a plant, the accelerated depreciation expenses deducted for tax purposes is higher than the straight-line depreciation amounts collected for ratemaking purposes. As a result, customers pay more for taxes in rates than the utility actually pays to the Internal Revenue Service. The difference between the taxes paid under accelerated depreciation and taxes assumed under straight-line depreciation is collected in a regulatory account and is known as ADIT. Later in the life of a plant, accelerated depreciation reverses and becomes less than straight-line depreciation, but the customers' rates stay the same. When the ratemaking expense is less than the tax expense, the company collects less

revenue for the payment of taxes than the amount of its tax liability, and the ADIT balance decreases, as previously collected amounts are used to pay taxes.

An ADIT balance represents cost-free capital for the utility to use. The cost-free nature of ADIT is recognized in ratemaking by including the ADIT balance as a deduction from rate base. This rate base deduction prevents customers from paying a return on the cost-free capital provided to the utility as a result of the tax timing differences. In theory, the ADIT balance for a plant item reaches zero as the effects of accelerated and straight-line depreciation converge at the end of the plant's depreciable life.

Section 393.1700.1(7)(a) provides that the amount of energy transition costs that a utility is allowed to securitize is to be reduced by the "applicable tax benefits of [ADIT]." A securitization financing order that includes retired or abandoned facility costs must include "a procedure for the treatment of [ADIT] . . . connected with the retired or abandoned facility." § 393.1700.2(3)(c)m. The statute states that ADIT "shall be excluded from rate base in future general rate cases and the net tax benefits relating to amounts that will be recovered through the issuance of securitized utility tariff bonds shall be credited to retail customers by reducing the amount of such securitized utility tariff bonds that would otherwise be issued." *Id.* The statute then states how this customer credit is to be calculated:

> The customer credit shall include the net present value of the tax benefits, calculated using a discount rate equal to the expected interest rate of the securitized utility tariff bonds, for the estimated accumulated and excess deferred income taxes at the time of securitization including timing differences created by the issuance of securitized utility tariff bonds

12

amortized over the period of the bonds multiplied by the expected interest rate on such securitized utility tariff bonds[.]

*Id.*

The parties disagreed over the correct interpretation of this calculation language. Liberty calculated the customer credit to be $4.7 million, while Staff calculated it to be $17.1 million.[4] Staff argued that Liberty's calculation method could lead to a double recovery of tax expenses for Liberty.

The Commission agreed with Staff's calculation method. The Commission found that Section 393.1700.2(3)(c)m requires the net present value of the full amount of Asbury's ADIT balance to be credited to customers. The Commission found that this ensures that Asbury's ADIT balance is excluded from Liberty's rate base calculation in future general rate cases, which means Liberty's customers will no longer benefit from Asbury's ADIT balance in future rate cases after receiving a credit for that balance in this securitization case. The Commission further found that Liberty's proposed calculation method inappropriately discounts Asbury's ADIT twice.

On appeal, Liberty argues the Commission's calculation violates the language of the statute because the statute requires the Commission to reduce the amount to be securitized by the net present value of the "tax benefits" of ADIT and not by the net present value of the full amount of the ADIT balance. Liberty further argues that the Commission's calculation is not supported by competent and substantial evidence

---

[4] The Commission argues that, on its face, Liberty's net present value of $4.7 million based on its estimated ADIT balance of $35.6 million is unreasonable in that no reasonable investor would accept this small fraction Liberty proposed.

13

because the Commission erroneously relied on conclusory information from a Staff witness on legal issues and ignored contrary evidence in the record. Lastly, Liberty contends the Commission's calculation is arbitrary, unreasonable, and an abuse of discretion because the Commission made an objective mistake in its calculation and failed to explain its reasoning.

Resolution of these issues requires interpreting Section 393.1700.2(3)(c)m. The interpretation of a statute is a matter of law, which we review *de novo. In re Laclede Gas Co.,* 417 S.W.3d 815, 819 (Mo. App. 2014). "Our goal in construing a statute is to ascertain the intent of the legislature from the language used and, if possible, give effect to that intent." *Id.* at 820. "In so doing, we consider the plain and ordinary meaning of the words used in the statute." *Id.* "We presume that the legislature intended for each word and phrase of a statute to have effect and that the legislature did not include idle verbiage or superfluous language." *Id.* (internal quotation marks and citation omitted). "If we find that the legislative intent is clear and unambiguous, then we are bound by that intent." *Id.*

We first consider Liberty's contention that the statute requires the Commission to reduce the amount to be securitized by the net present value of the *tax benefits* of the ADIT balance and not by the net present value of the *full amount* of the ADIT balance. Liberty argues the tax benefits of the ADIT balance are not synonymous with the full amount of the ADIT balance because the "legislature would not have referred separately, and in close juxtaposition" to the ADIT and to the tax benefits of the ADIT if those terms meant the same thing. Liberty also argues that it will have future income tax liability for

14

Asbury, and crediting customers with the net present value of the full amount of the ADIT balance will leave Liberty with insufficient funds to pay that tax liability.

The record supports the Commission's finding that Asbury's entire ADIT balance is, in fact, a "tax benefit." As we explained, *supra*, accelerated depreciation allows a utility to deduct a larger amount of a plant's depreciation expense from the utility's taxable income than is assumed for ratemaking purposes early in the plant's life, which means customers pay more for taxes in rates than the utility pays in taxes. The difference, which the utility collects as ADIT, is cost-free capital that the utility can use and invest. Later in the plant's life, as accelerated depreciation reverses and the utility collects less revenue for the payment of taxes than the amount of its tax liability, the ADIT balance decreases because it is used to pay taxes.[5] In theory, the ADIT balance connected to the plant would reach zero at the end of the plant's depreciable life; thus, the plant's full ADIT balance would be credited to customers when the effects of accelerated versus straight-line depreciation reverse, and the tax timing differences even out.

This process stopped, however, when Liberty abandoned Asbury.[6] Although Liberty claims it will have future income tax liability for Asbury, it fails to identify what

---

[5] The OPC, in agreement with the Commission, argues that Liberty should not retain a portion of Asbury's ADIT balance because the record shows that Asbury's ADIT is positive, meaning that Liberty realized less income tax liabilities (more income tax benefits) from Asbury than those that flowed to its customers.

[6] IRS Publication 946 states that depreciating property stops when property is retired from service, even if the cost or other basis is not fully recovered. Property is retired from service when it is permanently withdrawn from use in a trade or business or from use in the production of income. Publication 946, "How to Depreciate Property," IRS Pub. 946 (I.R.S.), 2018 WL 10602301, at *9.

that tax liability is. For tax purposes, when Liberty abandoned Asbury, Liberty claimed an abandonment loss deduction on Asbury's remaining accelerated depreciation balance, leaving only the remaining book depreciation to be recovered through securitization. For ratemaking purposes, Asbury's financial items, including depreciation expenses, were captured as a regulatory liability in an AAO until the plant was removed from rates.[7] The record shows that Staff argued that Liberty could use Asbury's ADIT to reduce an expense recovered by other means, resulting in double recovery of its tax expense. Staff argued that Asbury's ADIT would flow to shareholders as profit, contrary to Section 393.1700. A witness for the OPC testified that Asbury's costs were collected from customers beyond the plant's last operational date in December 2019. A Staff witness testified that Asbury was still included in rates and that the amounts Liberty sought to securitize for Asbury should be offset by the customer collections received. The Commission was free to find this testimony credible. *Spire,* 607 S.W.3d at 765.[8]

---

[7] In traditional ratemaking, regulatory liabilities are held in an AAO for possible future credit to customers. The Commission argues that, even without securitization, Liberty would not be entitled to Asbury's ADIT because in traditional ratemaking, Asbury's depreciation expenses in the AAO would be credited to customers. The Commission found that return on Asbury's component of the AAO liability should be used to offset Liberty's net balance of costs to be securitized, recognizing that Liberty's customers continued paying a full return on Asbury in rates since it was retired in December 2019, and the amount related to Asbury should be returned to customers.

[8] In its respondent's brief, the Commission states that, "[g]enerally, if the utility incurs tax expenses, the tax expenses can be considered for recovery in general rates." The Commission notes that Section 393.1700.1(8)(d) also provides that "[a]ny taxes . . . imposed on the revenues generated from the collection of the securitized utility tariff charge or otherwise resulting from the collection of securitized utility tariff charges" are "financing costs" that can be recovered through the securitized utility tariff charge. The Commission further notes that, as required by Section 393.1700.2(3)(c)e, the Amended Report and Order includes a true-up mechanism to ensure that the billing of securitized tariff charges provides timely payments of any amounts due in connection with the securitized utility tariff bonds, including financing costs. Because "[t]his

16

Asbury will not continue to depreciate over time. No further depreciation-related tax timing differences will occur, so Asbury's ADIT balance will never unwind and never be credited to customers absent Commission action. Because of this, Sections 393.1700.1(7)(a) and 393.1700.2(3)(c)m require the net present value of Asbury's ADIT balance to be credited immediately to customers when Liberty immediately recovers all of Asbury's energy transition costs through securitization. Therefore, the Commission's determination that the net present value of Asbury's full ADIT balance should be credited to customers is lawful and reasonable.

Liberty next argues that the Commission's net present value calculation is arbitrary, unreasonable, and constitutes an abuse of discretion because the Commission made an objective mistake in its calculation and failed to explain its reasoning. As we stated *supra*, the statute prescribes how the net present value of the ADIT credit is to be calculated:

> The customer credit shall include the net present value of the tax benefits, calculated using a discount rate equal to the expected interest rate of the securitized utility tariff bonds, for the estimated accumulated and excess deferred income taxes at the time of securitization including timing differences created by the issuance of securitized utility tariff bonds amortized over the period of the bonds multiplied by the expected interest rate on such securitized utility tariff bonds[.]

§ 393.1700.2(3)(c)m. In its findings of fact on this issue, the Commission found that a witness for Staff calculated the net present value of the ADIT offset to be $17,134,363. The Commission further found that this same witness "credibly explained that Liberty's

---

section referring to taxes does not mention ADIT," the Commission argues that "[t]he statute does not contemplate Liberty retaining Asbury's ADIT to pay future taxes that may be owed on the securitized utility tariff charges."

calculation of the net present value of its ADIT offset effectively and inappropriately discounted the ADIT twice by discounting the yearly amounts related to the remaining balance of ADIT, and then discounting the sum of the yearly amounts again." In its conclusions of law on this issue, the Commission stated, "The ADIT offset to the Asbury Energy Transition Cost balance is properly calculated using the methodology used by [the Staff witness]."

Based on our review of the record, the Commission's findings of fact and conclusions of law are sufficiently supported by the testimony of the Staff witness who calculated the ADIT offset at $17,134.363 and also provided a spreadsheet embedded with a 4% bond interest rate and net present value math equation to show how the figure was determined. As further explained in the Commission's brief on appeal, Staff's calculation complied with the method prescribed in Section 393.1700.2(3)(c)m by taking the following steps:

1. "First, Staff began with its estimated ADIT balance associated with Asbury at the time of securitization, $22,306,686."

2. "Next, Staff amortized the ADIT balance over the 13-year period of the bonds in equal installments of $1,715,899."

3. "Staff used a discount rate equal to its expected bond interest rate of 4 percent."

4. "Staff applied the discount rate to each annual amount by multiplying the expected bond interest rate by the 13-year timing difference created by the issuance of the bonds."

5. "Staff added up the discounted installments to determine the net present value of the ADIT tax benefits as $17,134,363."

18

We find no mistake or error in this calculation. The Commission followed the statutory requirements by taking Asbury's ADIT balance and amortizing the balance over the 13-year bond period in equal installments. The record shows Staff applied the 4% discount rate to each of the 13-year installments in the net present value equation to arrive at $17,134,363. In so doing, the Commission properly "applied the discount rate to each annual amount by multiplying the expected bond interest rate by the 13-year timing difference created by the issuance of the bonds," as required by Section 393.1700.2(3)(c)m. Point I is denied.

***Liberty's Fuel and Purchased Power Costs from Winter Storm Uri***

In Point II, Liberty contends the Commission erred in denying recovery through securitization of all of its fuel and purchased power costs from Winter Storm Uri. The qualified extraordinary costs that the legislature allows utilities to recover include "those related to purchases of fuel or power, inclusive of carrying charges, during anomalous weather events." § 393.1700.1(13). Those costs must have been prudently incurred. *Id*. Additionally, in its financing order, the Commission is required to find that the recovery of such costs "is just and reasonable and in the public interest," and that the recovery of the costs through securitization is "expected to provide quantifiable net present value benefits to customers as compared" to the recovery of such costs absent securitization. § 393.1700.2(3)(c)a, b. "'Just and reasonable' rates . . . allow public utilities to recover expenses that are (1) fair to both investors and ratepayers and (2) prudently incurred." *Spire Mo., Inc. v. Pub. Serv. Comm'n*, 618 S.W.3d 225, 232 (Mo. banc 2021). What is

19

just and reasonable depends on the facts and circumstances of each particular case. *State ex rel. Mo. Gas Energy v. Pub. Serv. Comm'n*, 186 S.W.3d 376, 384 (Mo. App. 2005).

In its Amended Report and Order, the Commission determined that Liberty's costs of $199,561,572 for Winter Storm Uri were prudently incurred costs of an extraordinary nature that would cause extreme customer rate impacts if reflected in customer rates recovered through customary ratemaking and, therefore, were qualified extraordinary costs under Section 393.1700.1(13). Of the $199,561,572 in total costs, the Commission found that approximately $193 million of these costs were for fuel and purchased power costs.

In determining how much of the fuel and purchased power costs Liberty should be allowed to recover through securitization, the Commission first found that, absent securitization, Liberty would typically recover its fuel and purchased power costs through a combination of its general rates and the FAC that is established in Liberty's tariff. Liberty's FAC includes a 95/5 sharing mechanism by which the company passes on 95% of over- or under-recoveries to its customers. If actual fuel costs exceed the general rate amount, Liberty recovers 95% of the difference through the FAC and absorbs 5%. If actual fuel costs drop below the amount in rates, Liberty's FAC credits customers with 95% of the difference and retains 5% for the utility. The Commission included this 95/5 sharing mechanism in Liberty's FAC to provide an incentive to Liberty to operate at an optimal efficiency while still providing the company an opportunity to earn a fair return on its investment.

The Commission noted that, because of the extraordinary amount of fuel and purchased power costs associated with Winter Storm Uri, Liberty did not seek to recover those costs through its FAC.[9] Instead, Liberty initially sought to recover those costs through an AAO, under which a utility is allowed to defer extraordinary costs for possible recovery in a future rate case. Specifically, in an AAO, the Commission could allow recovery under an appropriate amortization period, with the utility being allowed appropriate carrying costs during the period of amortization. The Commission found, based on Staff's testimony, that if an AAO were established for the recovery of the extraordinary fuel and purchased power costs associated with Winter Storm Uri, Staff would likely recommend at least a 10-year amortization period, with carrying costs calculated at the company's long-term debt rate. Additionally, the Commission further found, based on Staff's testimony, that if an AAO were established, Staff would apply the 95/5 sharing mechanism and not recommend recovery of 5% of the utility's fuel and purchased power costs because Staff believes it is appropriate to expect Liberty's shareholders to share in the financial impact of Winter Storm Uri.

The Commission concluded that applying the 95/5 sharing provision to Liberty's request to securitize the fuel and purchased power costs associated with Winter Storm Uri was appropriate under Section 393.1700.2(3)(c) because it would not be just, reasonable, or in the public interest to allow Liberty to recover the 5% of such costs that it would not be allowed to recover under traditional methods of ratemaking.

---

[9] Commission Rule 20 CSR 4240-20.090(8)(A)2.A(XI) provides that extraordinary costs are not to be passed through the company's FAC.

21

On appeal, Liberty contends there was no basis in precedent or in Section 393.1700 for the blanket disallowance of 5% of its fuel and purchased power costs for Winter Storm Uri and the disallowance was arbitrary and unreasonable. Noting that the Commission found that all of Liberty's fuel and purchased power costs for Winter Storm Uri were prudently incurred, Liberty argues that "costs prudently incurred for the benefit of customers are the epitome of just and reasonable and in the public interest." The Supreme Court, however, has expressly rejected a utility's "assertion that it is entitled to recover all prudent expenditures in its rates." *Spire*, 618 S.W.3d at 233. Indeed, in *Spire*, the Court stated that, in setting rates, the Commission "has broad discretion to include or exclude expenditures to arrive at rates it deems to be 'just and reasonable,' subject, of course, to judicial review that the [Commission]'s conclusions are supported by competent and substantial evidence and not arbitrary, capricious, or an abuse of discretion." *Id*.

In making its determination as to whether the fuel and purchased power costs Liberty was seeking to securitize were just, reasonable, and in the public interest, Section 393.1700.2(3)(c)a and b required the Commission to compare those costs to the costs Liberty would recover under other methods of ratemaking. The Commission did so, finding that Liberty typically recovers its fuel and purchased power costs in an FAC that includes a 95/5 sharing provision and that, if an AAO were established for the recovery of Liberty's extraordinary fuel and purchased power costs due to Winter Storm Uri, Staff would request that the 95/5 sharing provision be applied. The Commission concluded that application of the 95/5 sharing provision provided financial incentive and motivation

22

for Liberty to operate at maximum efficiency during extraordinary weather events and that it was appropriate to expect Liberty's shareholders to share in the financial impact of Winter Storm Uri; therefore, not allowing Liberty to recover 5% of the extraordinary fuel and purchased power costs was just, reasonable, and in the public interest. Liberty has failed to demonstrate that the Commission's decision is contrary to Section 393.1700 or is arbitrary or unreasonable. Point II is denied.

### Carrying Charges for the Asbury Plant

In Point III, Liberty contends the Commission erred in denying Liberty's request to securitize the carrying charges for Asbury from its retirement through May 2022. Liberty argues the Commission violates Section 393.1700 because the statute does not permit the Commission to deny recovery of certain carrying charges as to a retired plant merely because the plant is retired. Liberty further argues the Commission's decision is unreasonable because the cut-off date is arbitrary and penalizes Liberty's prudent decision to retire the Asbury plant. Lastly, Liberty argues the Commission's decision to calculate Asbury's carrying charges at Liberty's long-term debt rate rather than at its WACC violates Section 393.1700.

To securitize energy transition costs, retirement or abandonment of a facility must be deemed reasonable and prudent by the Commission. § 393.1700.1(7)(a). Section 393.1700.1(7)(a) provides that energy transition costs that may be recovered through securitization include "accrued carrying charges."[10] The statute does not define what

---

[10] The OPC correctly acknowledges in its brief that nothing in the statute explicitly states how to calculate the accrued carrying charges. The OPC reasons that, in the absence of a statutory

23

constitutes "carrying charges." "Absent a statutory definition, words used in statutes are given their plain and ordinary meaning with help, as needed, from the dictionary." *In re Amendment of Comm'n Rule*, 618 S.W.3d at 528 (citation omitted). The dictionary defines a "carrying charge" as an "expense incident to ownership or use of property." Merriam Webster Online Dictionary, https://www.merriam-webster.com/dictionary/carrying%20charges (last visited July 26, 2023). Where, as in this case, a statute contains a broadly defined ratemaking term, the Commission has "substantial discretion to select the appropriate method for determining" the utility's recovery. *Spire*, 607 S.W.3d at 770. The Commission's financing order must include a finding that the recovery of carrying charges through securitization, like the recovery of all other costs through securitization, is "just and reasonable" and "in the public interest." § 393.1700.2(3)(c)a.

Liberty petitioned for securitized recovery of Asbury's carrying charges from the date the plant was retired to the expected date of securitized bond issuance, at Liberty's 6.77% WACC rate. Liberty argues that a prudent plant retirement entitles shareholders to recover a full return on the plant's investments. In its Amended Report and Order, the Commission found that market pressure rendered Asbury uneconomic, and retiring the plant was a prudent decision that benefits customers. However, as we explained, *supra*, the Commission's finding that Asbury's retirement was a prudent decision does not entitle Liberty to recover all of its expenses simply because the retirement is deemed

---

requirement, the legislature has delegated the calculation of carrying charges to the Commission's expertise. *See Spire*, 607 S.W.3d at 765.

prudent. *See In re Kansas City Power & Light Co.'s Request for Auth. to Implement a Gen. Rate Increase for Elec. Serv. v. Mo. Pub. Serv. Comm'n*, 509 S.W.3d 757, 777-78 (Mo. App. 2016). Liberty "still has the burden of proof to show its expenses are just and reasonable." *Id*. at 778.

The Commission found that Asbury was effectively retired on December 12, 2019, when it stopped producing electricity. In its decision, the Commission noted that Missouri law generally holds that, for a utility to be able to recover a return on a property, the property must be used and useful, citing *State ex rel. Union Electric Company v. Public Service Commission of the State of Missouri*, 765 S.W.2d 618, 622 (Mo. App. 1988). The Commission further noted, however, that the securitization statute specifically includes carrying costs within the definition of energy transition costs that can be recovered through securitization. Because the securitization statute also requires the Commission to find that the securitized amount is just and reasonable, the Commission found that allowing Liberty to recover its full carrying costs on a generation facility that has not been used and useful since its effective retirement in December 2019 would not be just and reasonable. Therefore, the Commission found that, in these particular circumstances, a more limited recovery of carrying costs for the period after Asbury was removed from Liberty's rates, beginning in June 2022, and continuing through the issuance of the securitized bonds, at Liberty's 4.65% cost of long-term debt rather than at its WACC, is just and reasonable.

On appeal, Liberty argues that, because Section 393.1700.1(7)(a) allows a utility to collect carrying charges on retired plants, the Commission's denial of recovery of

those carrying charges from the effective date of the plant's retirement in December 2019 through June 2022 under the used and useful theory unreasonably equates to a denial merely on the basis that the plant is retired.  In response, the Commission argues the used and useful standard that it cited in the Amended Report and Order was just one circumstance for it to weigh in reaching a just and reasonable decision and was not the sole basis for its decision.[11]  Other circumstances the Commission considered included that Liberty recovered all of its Asbury costs from customers at a full 6.77% rate of return from time the plant shut down in December 2019 through May 2022 and, therefore, no carrying charges accrued during that time for purposes of Section 393.1700.1(7).  Liberty collected Asbury's full return, but tracked the amount as a regulatory liability.  The Commission explains that, for the period after Asbury was removed from rates, beginning in June 2022, the Amended Report and Order awarded Liberty carrying costs at a rate of 4.65% that accrued on the Asbury balance, and these carrying costs will continue until the securitized bonds are issued and Liberty recovers all of its energy transition costs.  At that point, Liberty's immediate lump sum recovery will be reduced by the customer credit that includes the December 2019 through May 2022 return on Asbury.  The Commission notes that the credit will not apply until Liberty is made whole for Asbury's costs.  The

---

[11] "In the field of utility rate making, two historic approaches have been taken to including or excluding property in the rate base where the property is not currently used to provide the service paid for by the rate, the used and useful theory and the prudent management theory."  *State ex rel. Mo. Power & Light Co. v. Pub. Serv. Comm'n of State of Mo.*, 669 S.W.2d 941, 946 (Mo. App. 1984).  "Under the used and useful theory, the company is allowed to charge customers only for the cost of plant and equipment actually in use to provide service for current customers."  *Id.*  It is within the Commission's authority to consider the used and useful standard as a factor in reaching a just and reasonable decision on Liberty's carrying charges.

Commission's order awarded Liberty $82.9 million in energy transition costs, including Asbury's full undepreciated balance and retirement costs recorded as regulatory assets through Asbury's AAO. Thus, Liberty's claim that the Commission denied carrying charges "merely because the plant is retired" is wrong.

Furthermore, Liberty's argument that the Commission's cutoff date is unreasonable is contrary to the evidence. The record shows that Liberty's environmental upgrades to Asbury account for 73% of the plant's total undepreciated investment.[12] The Commission explains that Liberty made these investments to extend the life of Asbury to 2035, yet Liberty abandoned the plant in 2019. Moreover, the Commission notes that, while customers received little benefit from these upgrades, Liberty would be fully reimbursed for them. Therefore, the Commission concludes, it is reasonable to credit customers with the return Liberty collected on Asbury and its upgrades while the plant was not in use from December 2019 through May 2022. The Amended Report and Order authorizes Liberty to securitize carrying charges for the period after Asbury was removed from rates, beginning in June 2022. Accordingly, the Commission's decision to start accruing carrying charges for Asbury in June 2022 is supported by the evidence.

Similarly, in contending that the Commission's rejection of Liberty's WACC rate on its carrying charges calculation violates the statute, Liberty cites no authority requiring the Commission to select one rate over another. Section 393.1700 does not mandate any particular treatment for regulatory liabilities, nor does it mandate use of Liberty's WACC

_____

[12] Liberty installed a $33 million selective catalytic reduction system to reduce Asbury's nitrogen oxide emissions in 2008. In 2014, Liberty retrofitted Asbury with a $141 million Air Quality Control System to comply with federal regulations.

27

in calculating accrued carrying charges. Additionally, "Missouri courts do not fix utility rates." *State ex rel. GTE N., Inc. v. Mo. Pub. Serv. Comm'n*, 835 S.W.2d 356, 361 (Mo. App. 1992). The Commission's decision to accept or reject a proposed measure to calculate utility rates involved in securitization is statutorily authorized. § 393.1700.2(3)(b), (c)a.

Furthermore, securitization is an alternative method for cost recovery. In determining whether securitization is just and reasonable and in the public interest, the statute authorizes the Commission to consider Liberty's prior financing orders. § 393.1700.2(3)(c)b. The Commission considered that, absent securitization, Asbury's AAO could have been addressed in Liberty's 2021 general rate case. In Liberty's 2021 rate case, Staff recommended Liberty's shareholders and customers share Asbury's unrecovered capital costs as of the plant's retirement date. Liberty chose to forgo that option and opt for securitization.

The Commission's order found that calculating Asbury's carrying charges using the WACC rate was not just and was unreasonable because customers would be required to pay a return on plant investments to shareholders.[13] The Commission found that the WACC rate is more appropriate for a used and useful plant, *i.e.,* shareholders may collect a return on a plant from customers when the plant provides service.

In the Amended Report and Order, the Commission awarded Liberty securitization of carrying costs at a rate that excludes shareholder equity amounts customers will pay in

---

[13] WACC is the weighted cost of the utility's capital structure, including debt and shareholder equity. *State ex rel. Pub. Counsel v. Pub. Serv. Comm'n*, 367 S.W.3d 91, 99 (Mo. App. 2012).

rates. Courts allow the Commission to allocate some risk of market forces to utility shareholders. *See Union Elec. Co*., 765 S.W.2d 618 at 622. The Commission's order awarding carrying charges at Liberty's long-term debt rate meets the statutory requirement that recovery of such costs is just and reasonable and in the public interest. § 393.1700.2(3)(c)a, b. Accordingly, we find no error in the Commission's decision to recover Asbury's carrying charges at Liberty's long-term debt rate. Point III is denied.

## CONCLUSION

The Commission's Amended Report and Order is affirmed.

LISA WHITE HARDWICK, JUDGE

All Concur.